IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA FIELDS, PAM GUNN, ROBIN          )
HALL, AND YEVETTE HAMILTON,            )
                                       )
            Plaintiffs,                )
                                       )
        vs.                            )          Case No. 03-cv- 4222-JPG
                                       )
THE ILLINOIS DEPARTMENT OF             )
CORRECTIONS,                           )
                                       **)**
            Defendant.                 *)*

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendant Illinois Department of Corrections ("IDOC") as to the claims in this case raised by

plaintiff Linda Fields[1] ("Fields") (Doc. 32).[2]  Fields has responded to the motion (Doc. 58) and

IDOC has replied to that response (Doc. 74).  In this case, Fields alleges that IDOC, her former

employer, is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., for sex

discrimination, for sexual harassment and for retaliation because she complained of that

harassment.[3]  IDOC contends that Fields cannot establish a case of discrimination, sexual

---

[1]At some points in this litigation, Fields's last name was Mott.  For simplicity's sake, the Court refers to her consistently as Fields.

[2]The Court notes that IDOC filed four separate summary judgment motions in this case, one addressed to each plaintiff's claims.  In ruling on each of the motions, the Court has been careful to confine its consideration to the evidence presented in connection with that particular motion and not to other evidence presented in connection with the other three motions, even if such other evidence would have been relevant to the motion at hand.  To the extent that the Court's rulings are inconsistent, that inconsistency is a product of the different evidence presented by the parties in connection with each motion and not by an improper application of the law.

[3]The Court construes this case as not asserting a "pattern-or-practice" Title VII cause of action.  Although the plaintiff's response to the summary judgment motion referred in passing to a "pattern-or-practice" theory, it analyzes this case as if it only asserted individual claims, confirming that she does not intend to assert such a claim.

harassment or retaliation and, if she can establish a sexual harassment case, it is entitled to assert an affirmative defense.

## I.      Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.  This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692.

Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.   Facts

Taken in the light most favorable to Fields, the evidence establishes the following facts.[4]

A.      <u>IDOC's Sexual Harassment Policy</u>

Fields, a woman, worked for IDOC from September 2000 until December 2004. At all relevant times, IDOC had a written sexual harassment policy, Administrative Directive ("AD") 03.01.310. As of December 1, 2002, that policy provided that sexual harassment included "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." A.D. 03.01.310 § II.E. The policy specifically noted that sexual harassment included

> Verbal conduct such as sexual innuendos, suggestive comments, insults, humor, or jokes about sex, anatomy, or gender-specific traits, sexual propositions, threats, repeated requests for dates, or statements about other employees, even outside their presence, of a sexual nature,

*Id.* at § II.F.1.d., and

> Physical conduct such as unwelcome hugging, touching, or kissing, pinching, brushing the body, coerced sexual acts, or actual assaults,

*Id.* at § II.F.1.g. The policy forbid engaging in or condoning sexual harassment, and obligated supervisors to "address[] an observed or reported incident of sexual harassment as a serious form

---

[4]The Court has omitted several alleged "facts" because they are supported only by hearsay, statements without personal knowledge, or otherwise inadmissible evidence. In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial. *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

of employee misconduct." *Id.* at § II.G.  It also required employees who witnessed or were aware of sexual harassment to report it in an incident report.  *Id.* at § II.G.3.  The policy also forbid retaliation against an employee who alleged sexual harassment in good faith.  *Id.* at § II.K.

The internal sexual harassment reporting policy in AD 03.01.310 required an employee who believed she was being harassed to notify her supervisor and document the incident with an incident report, to notify the next person in the chain-of-command if the supervisor was the harasser and document the incident with an incident report, or to notify IDOC's Office of Affirmative Action.  *Id.* at § II.H.2.  The IDOC employee receiving the report was then required to notify the warden of the facility, who was then required to notify the Office of Affirmative Action and to review and respond to the allegations within five working days, which may have included referring the matter for a formal investigation.  *Id.* at § II.H.4. & 6.  If it was determined that sexual harassment occurred, the warden was required to take "prompt, appropriate corrective action, including discipline, lockout, or other similar measures."  *Id.* at § II.H.8.c.  Although the policy urged employees to use the internal complaint process to obtain a resolution to sexual harassment complaints, it also allowed an employee to proceed directly to the Illinois Department of Human Rights or the Equal Employment Opportunity Commission ("EEOC").  *Id.* at § II.F.7.

Before beginning to work at an IDOC facility, Fields received a copy of and read IDOC's sexual harassment policy.

B.    Fields's Employment

Fields was first assigned to work as a correctional officer at Shawnee Correctional Center ("Shawnee") where she often worked with Lieutenants Paul Turner ("Turner") and Kerry Parker ("Parker"), both of whom displayed objectionable conduct toward Fields.

In 2001, Turner asked Fields when they were going to go somewhere together to have sex. Fields told him to stop and reminded him that he was married. Turner laughed at her response. This was Fields's first contact with Turner that she felt was inappropriate. She did not report the conduct at the time. Turner continued at other times to make other offensive comments to Fields, and she would either tell him to stop or ignore him.

In 2001, Parker joined in. He said to Fields, "Oh, girl, you are looking good" while staring at her "as if he were trying to undress" her with his eyes. Fields ignored the comment, did not view it as sexual harassment at the time and did not report it. On other occasions, Parker would tell her in a sexy voice she was "hot" while she was feeding inmates in their cells. Fields did not remember these incidents at the time of her deposition. In addition, Parker visited Fields at her work post often.

In late 2001 or early 2002, Turner commented to Fields that he believed women should not be allowed to work at Shawnee anywhere the inmates are housed. During that same time period, he also approached her once while she was stretching with her arms above her head and said, "Do that again so I can get a better look," referring to his view of her breasts. Fields did not say anything to Turner or report the comment at the time.

In early 2002, Turner approached Fields in the officers' dining room and asked her if her "titties" were getting bigger. Fields ignored the comment.

In early 2002, Fields began dating food supervisor Garrison Mott ("Mott"). Around that time, Turner was responsible for inspecting the tower where Fields was working alone. On four or more occasions, as he walked up the stairs to the room where she was, he would yell up to her, "Are you naked yet? Do you have your clothes off?" He would then say he should stop or Mott would get mad. Sometimes Fields ignored Turner, and sometimes she told him to stop. Fields

5

did not report Turner's comments to anyone at the time.

In 2002, one of Fields's coworkers believed her troubles were a result of her dating Mott and not paying attention to other IDOC male employees instead.

After she began to date Mott, Fields got into some trouble because of her phone use on the midnight shift.  Officers on the midnight shift used the phone frequently.  Turner observed that every time he visited Fields at work, she was on the phone;  he believed she was talking to Mott.  Her phone use, however, did not interfere with her job performance.  Turner told Fields once that she had been using the prison telephone too much, but he did not speak to others on Fields's shift who had used the phone the same amount of time.  Turner, Parker and Captain Qualls ("Qualls") discussed assigning Fields to the kitchen because they thought if she and Mott worked together, there would be no need for them to talk on the phone.  Fields and others believe the assignment was an effort to catch Mott and Fields improperly conducting their relationship during work hours.  Qualls made the final decision to reassign Fields to the kitchen.  Shawnee employees, including Turner, viewed kitchen assignments generally as punishment.  This punishment was especially harsh during the summer months because the kitchen was not air-conditioned.

While working in the kitchen in the summer of 2002 with co-plaintiff Yevette Hamilton, Hamilton told Fields she had overheard lieutenants in September 2000 betting on who would be the first to have sex with Fields when she first started working at Shawnee.  Indeed, lieutenants and correctional officers, including Parker on at least one occasion, would review the pictures of incoming female guards, comment on their attractiveness, and bet with each other about how long it would take them to sleep with the new female employees.  Fields and co-plaintiff Pamela Gunn ("Gunn") were subjects of one of these betting pools.

When Fields was eventually taken off the kitchen assignment, on July 18, 2002, she told Qualls she believed the she was being subjected to sexual harassment by being reassigned from the kitchen.  Qualls did not report Fields's complaint at the time.

On September 8, 2002, Turner approached Fields in the morning, saw her sticking something made of black plastic in her coat pocket and accused her of having a telephone hidden in her coat.  She told Turner he was crazy and, thinking he was referring to one of the institutions land-line phones instead of a cell phone, asked how she could have possibly fit a phone in her coat.  She offered to hand her coat to Turner and let him search it, but he refused.  Later, Fields realized Turner must have been looking for a cell phone, which is contraband.  Fields actually had at the time a handheld video game, which is also contraband, so she threw it in a trash dumpster at Shawnee.

Turner informed Captain Hoepker ("Hoepker") that he had seen Fields with what he believed was a cell phone.  Later Hoepker surreptitiously patted down Fields's coat while it was lying on a chair.  He then asked Fields to remove everything from her coat.  She removed various items but not a cell phone, and Hoepker said she was fine.

Later on the same day, Turner returned and told Fields to gather her things and report to the captain's office.  When she asked why, Turner told her he was not going to talk about it, and he said he had tried to warn her about this.  Fields then asked him why he refused to search her coat when she asked him to, and he said it would have been inappropriate.  He was aware that she had complained to Qualls about sexual harassment two months earlier and thought that searching her coat could have been construed as sexual harassment.  Fields then asked him why he did not think it was inappropriate to ask her to go home with him to have sex, and told him she was going to call her attorney the following morning.  When Fields arrived at the captain's

7

office in tears, Hoepker said she would need to be shaken down, which involves stripping down

to one's underclothing.  Fields went to the gate house to be shaken down by a female officer, but

after she stripped to her underclothing in private, someone deliberately opened the door to allow

Hoepker, the male union steward and the male correctional officer working in the gatehouse to

see her in her underclothing and verify that she had no cell phone on her person.  No cell phone

was found in Fields's possessions or clothing or on her person.  She went home immediately

after this incident.  High-level IDOC employees have walked around the institution openly with

cell phones.

        In addition to the aforementioned conduct, IDOC employees exhibited objectionable

conduct not aimed directly at Fields as well.  For example, one IDOC employee once referred to

Fields as "fresh meat."  It was also not unusual for male correctional officers to talk about the

physical attributes of female officers outside their presence.  In addition, Turner once told co-

plaintiff Robin Hall ("Hall") that he liked her new uniform because it made her breasts look

bigger.  He also asked Gunn at least 20 times from 2001 to mid to late 2002, in reference to her

breasts, "When are you going to let me see those things?" or "When are you going to show me

those titties?" and he asked her to unbutton the top button of her shirt for him when he was in a

position to look down her shirt.  In addition, Parker and Turner would hear correctional officers

making sexual comments or telling sexual jokes but would not object to them except, in Turner's

case, if women were present.  Turner never reported any violation of the sexual harassment

policy.

        In addition, two lieutenants failed to report rumors that Parker had engaged in a

consensual sexual relationship with a subordinate female officer ("J.C.") under his supervision

while on duty at Shawnee, a violation of a standard of conduct, although one of those lieutenants

did interview Parker about the rumor.  Parker admitted that he had a "personal relationship" with

J.C. during work hours but did not specify further the nature of that relationship.  J.C. brought

contraband roller blades on the prison grounds at one time.  Qualls told her to take the

contraband out of the facility but did not issue her any discipline for having the contraband.

Lieutenant Laster saw J.C. with a DVD player, also contraband, and told Qualls, but J.C. was not

written up for the violation.

In August 2002, Turner and Qualls were called to wake up correctional officer Bob

Comer ("Comer"), who was drunk and had passed out on duty.  They arranged for someone to

drive him home and did not report him despite the fact that being drunk on the job was a

reportable incident.

Neither Parker nor Turner had the authority to give Fields an official "counseling," the

first step in a progressive discipline system, or to hire, fire, promote, or discipline her.

C.      Sexual Harassment Complaints and IDOC's Response

On September 8, 2002, following Fields's shake down, she complained to Assistant

Warden Windsor about the sexual harassment of herself and female employees at Shawnee in

general as well as retaliation for failing to acquiesce in the sexual harassment.  Fields also

submitted an incident report on the same day.  In response to her incident report, IDOC directed

Captain Homer Markel ("Markel"), an officer from another IDOC facility, to investigate sexual

harassment at Shawnee.  He began the investigation on September 12.

In October, Markel concluded that Parker and Turner violated IDOC's sexual harassment

policy by their conduct directed toward Fields and others and that Turner violated other IDOC

policies as well, including a standard of conduct that forbid  interfering with an investigation by

intimidating witnesses.  Markel further recommended that Parker and Turner receive additional

training on sexual harassment.

Parker and Turner went before the Employee Review Board ("ERB"), and the hearing officer recommended that Shawnee's warden suspend both employees.  The warden issued Parker a one-day suspension, which was reduced to a written reprimand after he grieved the action.  The warden issued Turner a five-day suspension, which was reduced to a one-day suspension after he grieved the action.  Neither Parker nor Turner received additional training on sexual harassment beyond the routine training already provided.

On October 4, 2002, Fields signed a charge with the EEOC complaining of sex discrimination, sexual harassment and retaliation.  In that charge, she did not mention that she viewed her work assignment to the kitchen as punishment or as sex discrimination.  The EEOC received the charge on November 12, 2002.

Pursuant to an instruction from a warden, on December 6, 2002, Qualls finally filed an incident report about Fields's July 18, 2002, complaint of sexual harassment.

D.    Post-Complaint Treatment

Upon her return to work after maternity leave in May 2003, some of Fields's coworkers ostracized her.  For example, she saw J.C., the subordinate female officer with whom Parker had a personal relationship, on the prison grounds watching a DVD on a DVD player with a lieutenant.  Another officer commented that J.C. should put the DVD player away so Fields would not tell on her.  Other IDOC employees refused to talk to her.

At some point, the warden refused to investigate an incident report in which correctional officer Monica Quigley ("Quigley"), a female friend of Fields and Gunn, reported that she was afraid because another female correctional officer had expressed doubts about being able to come to her aid in a prison emergency.  The warden also failed to respond Quigley's subsequent

10

incident report complaining of his failure to address her first incident report.

Fields transferred to the Hardin County Work Camp in July 2003, and worked there until August 2004. She then took leave for another pregnancy and never returned to work for IDOC. Her official termination date was December 8, 2004.

Fields experienced stress and emotional trauma from the events set forth above. She had trouble sleeping and had nightmares, some about Turner. As a consequence, she has sought psychological counseling.

The EEOC issued Fields a right to sue letter, and in December 2003 she, along with three other female IDOC employees, timely filed this lawsuit alleging claims of sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) (Count I), and retaliation for complaining to their supervisors of that sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count II). In December 2005, the plaintiffs amended the complaint to allege an additional retaliation claim that does not involve Fields.

**III.     Analysis[5]**

Title VII prohibits discrimination on the basis of sex: "It shall be an unlawful

---

[5]The Court is dismayed by the disorganization of the plaintiff's brief, despite her having been given a second chance at formulating an appropriate brief. Nevertheless, the Court has bent over backwards to do justice to the parties in this case by deciphering the plaintiff's confusing and sometimes illogical arguments. The Court reminds the plaintiff that it is not its job to do counsel's work of organizing or formulating a party's arguments, *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999), nor is it the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). To the extent that the Court has been unable to detect an argument intended to be advanced by the plaintiff, the Court finds that the argument is waived because it was not properly supported. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

employment practice for an employer to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. §

2000e-2(a)(1).  It also prohibits retaliation for reporting sex discrimination:  "It shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

The Court will address each of Fields's three Title VII theories in turn.

A.    Sex Discrimination other than a Hostile Environment

It appears that Fields is alleging that she was treated differently because of her sex in

ways other than being exposed to a hostile environment.  To withstand a motion for summary

judgment on this type of disparate treatment sex discrimination claim, a Title VII plaintiff may

present direct proof of discrimination through direct or circumstantial evidence.  *Walker v.*

*Glickman*, 241 F.3d 884, 888 (7th Cir. 2001);  *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395

(7th Cir. 1998).  A plaintiff may also proceed using the burden shifting mechanism outlined in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the direct method of proving discrimination, the plaintiff may rely on direct

evidence of an acknowledgment of discriminatory intent or on circumstantial evidence sufficient

to provide a basis for inferring intentional discrimination as motivating the employer's adverse

employment action.  *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing

*Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)).  Historically, direct evidence has

been viewed as evidence that is within a witness's personal knowledge and does not require

12

drawing an inference to support the proposition for which it is offered, and circumstantial evidence has been viewed as evidence requiring such an inference  *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).  This distinction is vague and irrelevant;  any evidence supporting a finding of discrimination is sufficient to withstand summary judgment under the direct method.  *Id.*

Under the *McDonnell Douglas* indirect method, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she was treated less favorably than others not in the protected class who were similarly situated.  *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003).  A plaintiff's successful demonstration of each of these elements creates a rebuttable presumption of discrimination.  *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003**)**.  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext.  *Id.*  At the pretext stage, the plaintiff need not provide evidence of the defendant's discriminatory motive so long as he provides evidence from which a reasonable trier of fact could find that the proffered reason was not genuine, that is, was a lie.  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006);  *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 699 (7th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000)).  It is important to note that the ultimate burden of persuasion remains at all times with the plaintiff.  *Reeves*, 530 U.S. at 143 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Fields argues that she can establish sex discrimination through both the direct and

indirect methods.  IDOC, on the other hand, challenges Fields's ability to prove that she suffered

an adverse employment action, a requirement for proceeding under either method.  *Oest v.*

*Illinois Dep't of Corr.,* 240 F.3d 605, 611-12 (7th Cir. 2001).  It also contests her ability to show

any similarly situated male employees who were treated better than she was, an essential element

of the *prima facie* case under the *McDonnell Douglas* scheme.

        1.      <u>Adverse Employment Action</u>

In order to establish an adverse employment action as that phrase is understood in the

Title VII context, a plaintiff must show a "quantitative or qualitative change in the terms or

conditions of [her] employment that is more than a mere subjective preference."  *Johnson v.*

*Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003);  *see Herrnreiter v. Chicago Hous. Auth.*,

315 F.3d 742, 744-45 (7th Cir. 2002).  Adverse employment actions generally fall into three

categories.

> (1) cases in which the employee's compensation, benefits or other financial terms
> of employment are diminished, including cases where employment is terminated;
> (2) cases in which a nominally lateral transfer without a change in financial terms
> significantly reduces the employee's career prospects by preventing him from
> using the skills in which he is trained and experienced; and (3) "[c]ases in which
> the employee is not moved to a different job or the skill requirements of his
> present job altered, but the *conditions* in which he works are changed in a way
> that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise
> significantly negative alteration in his workplace environment – an alteration that
> can fairly be characterized as objectively creating a hardship, the classic case
> being that of the employee whose desk is moved into a closet."

*Tart v. Illinois Power Co.*, 366 F.3d 461, 475-75 (7th Cir. 2004) (quoting *Herrnreiter*, 315 F.3d

at 744-45) (emphasis in original).  "Tangible employment actions are the means by which the

supervisor brings the official power of the enterprise to bear on subordinates.  A tangible

employment decision requires an official act of the enterprise, a company act."  *Burlington*

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998).

However, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (internal quotations, citations and ellipsis omitted). Actions that do not significantly affect a plaintiff's job responsibilities or benefits, or actions that cause mere inconveniences, cannot be tangible employment actions. *Id.*.

In this case, Fields has not shown any tangible job consequence she suffered because of her sex. There is no evidence that the financial terms of her employment or her career prospects were affected or that the conditions in which she worked were altered to create an objective hardship. Fields first argues that her reprimand from Turner about her phone usage was an adverse employment action. However, the law is clear that an oral warning, in the absence of some tangible job consequence, does not qualify as an adverse employment action that is actionable under Title VII. *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 2986 (2006); *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001).

Fields next points to her assignment to the kitchen, which she admits "was one which fell within those tasks officers could be expected to perform." Field's Resp. Sum. J. Mot. at 9. Although it was unpleasant and may have been used as a punishment by superior officers, it was not such an objectively inferior job assignment, especially when given as a temporary assignment, that it constituted an adverse employment action. An employee's "subjective preference for one position over another" where both positions are otherwise equivalent does not establish that assignment to the non-preferred position is an adverse employment action. *Herrnreiter*, 315 F.3d at 744-45. Furthermore, the evidence indicates that Fields *liked* working

15

in the kitchen, at least in the summer of 2002 when she was dating Mott, and complained when she was removed from that position.  Because Fields's assignment to the kitchen amounted to no more than a mere inconvenience and did not significantly alter her job responsibilities, it was not an actionable adverse employment action.

Finally, Fields argues that the investigation into Turner's allegations that she possessed a cell phone was an adverse employment action.  However, a mere investigation of alleged wrongdoing that is not accompanied by any discipline that amounts to an adverse employment action is not actionable.

Because Fields cannot establish an adverse employment action, she cannot prevail on her claim of sex discrimination.

2. <u>Similarly Situated Men/Inference of Causation</u>

In addition, Fields has pointed to no evidence from which a reasonable jury could find that any employment action (whether actionable or not) was taken because of her sex and has pointed to no male co-worker who was similarly situated to her and was treated differently.

Fields argues that Comer was a similarly situated male correctional officer who Turner did not write up for being drunk and passing out at work, while Turner did report Fields for having a contraband cell phone at work.  To be similarly situated, an employee must be "directly comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  Those "material respects" depend on the specific situation involved in the case and may include whether the employees dealt with the same supervisor, were subject to the same standards, or had comparable experience, education and qualifications, if the employer took these factors into account when making the personnel decision in question.  *Id.*  Fields has not shown that Comer was directly comparable to her.  Although they were both correctional

16

officers, their rule violations were completely different, involving different aspects of institutional security and requiring different institutional actions to confirm, and cannot therefore be deemed similar. Furthermore, she and Comer were ultimately treated the same in that neither of them were written up for their violations. Thus, Fields cannot establish that Comer was a similarly situated male who was treated differently that she was.

Furthermore, Fields has not presented any other direct or circumstantial evidence from which a jury could reasonably infer that any employment action was taken against her because of her sex. There is simply no evidence that the investigation into Fields's suspected contraband was because she was a woman. As for the other two alleged adverse actions, males were assigned to work in the kitchen and other females were not reprimanded for their phone use on the midnight shift. Thus, the evidence shows that these actions were not implemented along gender lines.

For these reasons, the Court finds that there is no genuine issue of material fact and IDOC is entitled to summary judgment as a matter of law on Fields's sex discrimination claim other than her hostile environment claim.

B.    Sexual Harassment

The sex discrimination prohibited by Title VII includes sexual harassment that is so severe or pervasive that it alters the condition of the victim's employment and creates an abusive working environment even where there is no tangible employment action. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Courts generally refer to these types of cases as "hostile environment" cases. The Court views Fields's claim as such a case and not as a *quid pro quo* sexual harassment case (to the extent that those labels are helpful in sexual harassment cases) because Fields has not provided evidence of a tangible employment action resulting from the

17

sexual harassment.

There is simply no evidence that either Parker's or Turner's sexual harassment affected the tangible aspects of Fields's job because she did not acquiesce to their harassment or, as discussed in the previous section, that in any other way she was subject to a tangible employment action.  Thus, the Court treats Fields's sexual harassment claim as a hostile environment claim.    In this case, with respect to the question of whether Fields's work environment was an actionable hostile environment, IDOC argues that the conduct Fields describes was not severe or pervasive enough to be actionable and that there is no basis to hold IDOC liable.  Fields disagrees.

1.    Hostile Environment

The Court concludes that there is not sufficient evidence for a reasonable jury to find that Fields was subject to an actionable hostile environment.  A hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)) (further internal quotations omitted); *see also*; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998);  *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003). "Harassment need not be severe *and* pervasive to impose liability;  one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

Whether an environment is objectively sufficiently hostile or abusive must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S.

18

at 787-788 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)) (further internal quotations omitted); *accord Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888-89 (7th Cir. 2001). Courts "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Breeden*, 532 U.S. at 271. For example, a court has found that "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998). On the other hand, an uninvited kiss and an attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim. *Hostetler*, 218 F.3d at 807-08.

In addition, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke v. Stefani Mgmt. Servs.*, 250 F.3d 564, 566-67 (7th Cir. 2001) (citing *Harris*, 510 U.S. at 21-22); *accord Murray*, 252 F.3d at 889.

This is a close case, but considering all the circumstances the Court must conclude that Fields has not presented enough evidence from which a reasonable jury could find she was subject to a work environment that was subjectively and objectively hostile. Parker's and

19

Turner's behavior mostly consisted of relatively innocuous and non-threatening offensive utterances and occurred on approximately a dozen occasions over a time period of at least several months.  Turner also singled Fields out for her telephone use, but again, even assuming that he selectively reprimanded her and played a role in her reassignment to the kitchen because she was focusing her attention on Mott instead of Turner and others, Turner's reprimand and Fields's reassignment were fairly innocuous, not the sort of behavior that contributed to a "hellish" working environment.  *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("The workplace that is actionable is the one that is 'hellish.'").  These incidents, individually or collectively, would not amount to a hostile environment and, indeed, Fields appeared to view them as offensive annoyances rather than serious alternations in her work environment.

The Court is given pause, however, by the shake down incident.  Admittedly, a shake down is an embarrassing event, even if it is conducted by a member of the same sex.  Fields's shake down became humiliating, however, when other male employees were allowed unnecessarily to view her in her underwear.  The Court is mindful that shake downs of prison staff are occasionally necessary to prevent contraband from being introduced into the institution. However, the events leading to Fields's shakedown raise some questions.  It is clear that Turner had some reason for suspecting that Fields possessed a contraband cell phone;  she admitted that she had a handheld video game which could have mistakenly been taken for a cell phone.  It is also clear that Turner could have immediately resolved questions about contraband by searching her coat when she first offered it, which presumably would have yielded the contraband video game.  Does the fact that he did not immediately search her coat and instead reported her to Hoepker constitute harassment?  It is reasonable to assume that Turner knew Fields might get in

20

trouble with Hoepker but it is not reasonable to assume that he knew or intended that a shake down would result from his report. It was Hoepker's failure to find the alleged contraband in his searches that ultimately led to the shake down, and there is no evidence that conducting a shake down in that situation was unreasonable or that shake downs were disparately applied to women accused of having contraband that cannot be found in their belongings as opposed to men in the same situation. Further diminishing the importance of this incident is that it occurred only once. Thus, to the extent that it constituted harassment because of sex, it was an isolated incident.

As noted above, this is a close case. All in all, even considering the humiliating shake down of Fields as an incident of sexual harassment, the Court finds that the conduct of IDOC's employees was not so severe or pervasive that it made Fields's workplace objectively hostile. One incident was humiliating, but the remainder amounted to offensive utterances. None were physically threatening, and none appeared to make Fields's job more difficult or to otherwise interfere with her ability to do her job. For these reasons, no reasonable jury could find that the harassment suffered by Fields altered the conditions of her employment and created an abusive working environment.

In making its decision, the Court did not consider the incidents Fields did not know about while working at the prison. "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)." *Mason*, 233 F.3d at 1046. Thus, the Court cannot consider the comments about female correctional officers' attractiveness or sexual jokes outside Fields's presence, including the comments to Hall and Gunn, or any other incident about which Fields did not know.

Because the Court has determined that no reasonable jury could find Fields's working environment actionably hostile, the Court need not examine the issues of whether IDOC is

entitled to assert the *Faragher/Ellerth* affirmative defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

    C.    <u>Retaliation</u>

    Fields alleges that IDOC retaliated against her after she complained of sexual harassment when several of her coworkers ostracized her, which made Fields feel like she could not rely on her fellow officers to protect her safety.  However, this is not sufficient adverse action to support a retaliation claim.

    To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an indirect, burden-shifting method.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004);  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004);  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Under both methods, the plaintiff must present evidence of some adverse action by her employer.  *Rhodes*, 359 F.3d at 508; *Stone*, 281 F.3d at 644.

    While what constitutes an adverse action in the Title VII retaliation context has engendered much confusion among the Courts of Appeals, the Supreme Court has recently clarified the appropriate standard in *Burlington Northern & Santa Fe Railway Co. v. White,* 126 S. Ct. 2405, 2410-11 (2006).  In *White*, the Supreme Court held that the adverse action necessary for a retaliation case did not need to affect the terms and conditions of an employee's employment and did not even need to occur at the workplace.  *Id.* at 2409, 2414.  Instead, it held that a successful Title VII retaliation plaintiff must only establish an "employer action[] that would have been materially adverse to a reasonable employee."  *Id.* at 2409.  In cases like *White*, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" would qualify.  *Id.*  A similar standard would

apply where adverse action is allegedly in retaliation for complaining of sexual harassment.

In this case, no reasonable jury could find that the actions Fields believes were retaliatory were harmful to the point that they would dissuade a reasonable correctional officer in Fields's position from complaining of sexual harassment.  She points to several officers who expressed a fear that she would turn them in for possessing contraband in the institution, and she argues that that put her in fear for her safety.[6]  However, no reasonable jury could find that such snubbing by a few fellow employees could cause a reasonable officer in Fields's position to be in such fear for her safety that she would be dissuaded from further complaining of sex discrimination or harassment.  Her coworkers' comments were childish responses to her legitimate and well-founded complaints about a serious problem in modern workplaces.  They were not, however, materially adverse actions under Title VII retaliation law.

For this reason, the Court finds that IDOC is entitled to summary judgment on Fields's retaliation claims.

IV.     **Conclusion**

For the foregoing reasons, the Court **GRANTS** IDOC's motion for summary judgment on all of Fields's claims (Doc. 32) and **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**Dated:  September 12, 2006**

s/ J. Phil Gilbert
**J. Phil Gilbert, U.S. District Judge**

---

[6]She may also be attempting to rely on two other facts:  (1) another correctional officer's statement to Quigley, one of her female friends, implying that the other officer would not come to her aid in an emergency situation and (2) IDOC's refusal to follow up on an incident report complaining of that statement.  However, because there is no evidence that Fields knew about this statement, its value as evidence of retaliation against Fields is significantly reduced.