IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LINDA FIELDS, PAM GUNN, ROBIN HALL, AND YEVETTE HAMILTON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 03-cv- 4222-JPG |
| THE ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendant Illinois Department of Corrections ("IDOC") as to the claims in this case raised by

plaintiff Pam Gunn[1] ("Gunn") (Doc. 31).[2]  Gunn has responded to the motion (Doc. 59) and

IDOC has replied to that response (Doc. 72).  In this case, Gunn alleges that IDOC, her

employer, is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., for sex

discrimination, for sexual harassment and for retaliation because she complained of that

harassment.[3]  IDOC contends that Gunn cannot establish a case of discrimination, sexual

---

[1]At some points in this litigation, Gunn's last name was Scott.  For simplicity's sake, the Court refers to her consistently as Gunn..

[2]The Court notes that IDOC filed four separate summary judgment motions in this case, one addressed to each plaintiff's claims.  In ruling on each of the motions, the Court has been careful to confine its consideration to the evidence presented in connection with that particular motion and not to other evidence presented in connection with the other three motions, even if such other evidence would have been relevant to the motion at hand.  To the extent that the Court's rulings are inconsistent, that inconsistency is a product of the different evidence presented by the parties in connection with each motion and not by an improper application of the law.

[3]The Court construes this case as not asserting a "pattern-or-practice" Title VII cause of action.  Although the plaintiff's response to the summary judgment motion referred in passing to

harassment or retaliation and, if she can establish a sexual harassment case, it is entitled to assert an affirmative defense.

## I.      Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.  This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion.  *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not

---

a "pattern-or-practice" theory, it analyzes this case as if it only asserted individual claims, confirming that she does not intend to assert such a claim.

demonstrated by the mere existence of "some alleged factual dispute between the parties,"

*Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692.

Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict

for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252; *accord*

*Michas*, 209 F.3d at 692.

## II.     Facts

Taken in the light most favorable to Gunn, the evidence establishes the following facts.[4]

### A.     IDOC's Sexual Harassment Policy

Gunn, a woman, has worked for IDOC since September 2000.  At all relevant times,

IDOC had a written sexual harassment policy, Administrative Directive ("AD") 03.01.310.  As

of December 1, 2002, that policy provided that sexual harassment included "verbal or physical

conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an

individual's work performance or creating an intimidating, hostile, or offensive working

environment."  A.D. 03.01.310 § II.E.  The policy specifically noted that sexual harassment

included

> Verbal conduct such as sexual innuendos, suggestive comments, insults, humor,
> or jokes about sex, anatomy, or gender-specific traits, sexual propositions, threats,
> repeated requests for dates, or statements about other employees, even outside
> their presence, of a sexual nature,

---

[4]The Court has omitted several alleged "facts" because they are supported only by
hearsay, statements without personal knowledge, or otherwise inadmissible evidence.  In ruling
on a motion for summary judgment, the Court considers only evidence that would be admissible
at trial.  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

*Id.* at § II.F.1.d., and

> Physical conduct such as unwelcome hugging, touching, or kissing, pinching,
> brushing the body, coerced sexual acts, or actual assaults,

*Id.* at § II.F.1.g.  The policy forbid engaging in or condoning sexual harassment, and obligated

supervisors to "address[] an observed or reported incident of sexual harassment as a serious form

of employee misconduct." *Id.* at § II.G.  It also required employees who witnessed or were

aware of sexual harassment to report it in an incident report.  *Id.* at § II.G.3.  The policy also

forbid retaliation against an employee who alleged sexual harassment in good faith.  *Id.* at § II.K.

The internal sexual harassment reporting policy in AD 03.01.310 required an employee

who believed she was being harassed to notify her supervisor and document the incident with an

incident report, to notify the next person in the chain-of-command if the supervisor was the

harasser and document the incident with an incident report, or to notify IDOC's Office of

Affirmative Action.  *Id.* at § II.H.2.  The IDOC employee receiving the report was then required

to notify the warden of the facility, who was then required to notify the Office of Affirmative

Action and to review and respond to the allegations within five working days, which may have

included referring the matter for a formal investigation.  *Id.* at § II.H.4. & 6.  If it was determined

that sexual harassment occurred, the warden was required to take "prompt, appropriate corrective

action, including discipline, lockout, or other similar measures."  *Id.* at § II.H.8.c.  Although the

policy urged employees to use the internal complaint process to obtain a resolution to sexual

harassment complaints, it also allowed an employee to proceed directly to the Illinois

Department of Human Rights or the Equal Employment Opportunity Commission ("EEOC").

*Id.* at § II.F.7.

IDOC trained new employees about the sexual harassment policy before they started their

jobs.  In addition, all employees were trained yearly about sexual harassment, which included

review of the sexual harassment policy, watching a training video, taking a test and participating

in a general discussion.

Before beginning to work at an IDOC facility, Gunn attended a six-week training course

that included training on sexual harassment.  She was then assigned to work as a correctional

officer at Shawnee Correctional Center ("Shawnee"), a high-medium security facility, where she

received additional training on IDOC's discrimination and harassment policy, AD 03.01.307,

and sexual harassment policy, AD 03.01.310.

B.      Gunn's Employment

A week into her new job, Gunn was assigned to work the "midnight shift," which ran

from 11 p.m. to 7 a.m.  For three to four months she worked as a relief officer, where she filled

in for others who were absent from work in a variety of jobs including working at the gatehouse

and the kitchen.  IDOC had assigned at least three men – Brian Collie, Brent Lee Sims and Ricky

Pearl – to work in the kitchen.  Gunn was then assigned to work five days a week  monitoring

various wings of the prison that housed the inmates.  She was one of the first women correctional

officers to receive such an assignment;  many women correctional officers who had worked at

Shawnee far longer than Gunn were never required to work on the wings at all.  Gunn enjoyed

the work.

Lieutenant Parker ("Parker") worked with Gunn on the midnight shift.  Beginning in mid

to late 2001 and continuing to August 2002, Parker would comment, to Gunn directly and to

others who then related it to Gunn, about how her rear end had gotten larger since she started

working at IDOC.  Gunn was offended by Parker's comments, told him numerous times that she

did not appreciate them and asked him to stop.  Parker also made "a bunch of other little comments" of a sexual nature on a continuing basis mostly about her rear end, including a comment about her rear end in front of the otherwise all male TACT team, a group of correctional officers specially trained in removing uncooperative inmates from their cells, and a comment in September 2002 to a male officer outside Gunn's presence that his rear end was almost as big as Gunn's.  Gunn did not report Parker's comments to anyone at the time.

Parker's behavior was not limited to comments.  In early 2001, Parker snuck behind Gunn in the officer's commissary and surreptitiously unhooked her bra.  He then laughed and bragged to others in the vicinity that it had taken him years to master that skill but that he was now "professional."  Gunn did not report this incident to anyone at that time.

Lieutenant Turner ("Turner") also worked with Gunn on the midnight shift.  Unlike Parker, Turner appeared to be more interested in Gunn's breasts than her rear end.  His comments to her began as "little flirtatious comments" like "You're sexy," but escalated to more uncomfortable comments.  For example, he asked her at least 20 times from 2001 to mid to late 2002, in reference to her breasts, "When are you going to let me see those things?" or "When are you going to show me those titties?"  In the fall of 2002, he also asked her to unbutton the top button of her shirt for him when he was in a position to look down her shirt.  He was also always telling her that she looked good and that her hair looked good, but she did not necessarily take offense at such comments.  Turner also told her twice in either 2001 or 2002 that curly hair like hers turned him on.  Gunn hinted to Turner that she did not like his comments but never explicitly told him to stop or filed an incident report about his comments.

Neither Parker nor Turner had the authority to hire, fire, promote or discipline Gunn.

6

In addition, to Parker's and Turner's conduct toward Gunn, they and other IDOC employees exhibited objectionable conduct outside Gunn's presence.  For example, lieutenants and correctional officers, including Parker on at least one occasion, would review the pictures of incoming female guards, comment on their attractiveness, and bet with each other about how long it would take them to sleep with the new employees.  Gunn and co-plaintiff correctional officer Linda Fields ("Fields") were subjects of one of these betting pools, and one IDOC employee once referred to Fields as "fresh meat."  It was also not unusual for male correctional officers to talk about the physical attributes of female officers outside their presence.  In addition, Parker and Turner would hear correctional officers making sexual comments or telling sexual jokes but would not object to them except, in Turner's case, if women were present. Turner never reported any violation of the sexual harassment policy.

In addition, two lieutenants failed to report rumors that Parker had engaged in a consensual sexual relationship with a subordinate female officer ("J.C.") under his supervision while on duty at Shawnee, a violation of a standard of conduct, although one of those lieutenants did interview Parker about the rumor.  Parker admitted that he had a "personal relationship" with J.C. during work hours but did not specify further the nature of that relationship.

C.    <u>Sexual Harassment Complaints and Investigation</u>

Things changed when Fields submitted an incident report on September 8, 2002, complaining of sexual harassment of herself and female employees at Shawnee in general as well as retaliation for failing to acquiesce in the sexual harassment.  Fields's incident report indicated that Gunn was willing to testify to the sexual harassment.

Shortly thereafter, Gunn told Lieutenant Qualls ("Qualls") about the sexually harassing

7

environment she experienced at the prison, including specifically about Parker's remarks concerning her rear end. Qualls directed Gunn to file an incident report regarding Parker's conduct and the offensive work environment. Gunn filed an incident report on September 11 specifically mentioning Parker's comment comparing the size of a male correctional officer's rear end to hers and generally mentioning offensive comments by Parker about her rear end over the prior sixteen months. On October 4, Gunn also signed a charge with the EEOC complaining of sex discrimination, sexual harassment and retaliation. The EEOC received the charge November 12.

In response to Fields's incident report, IDOC directed Captain Homer Markel ("Markel"), an officer from another IDOC facility, to investigate sexual harassment at Shawnee. He began the investigation on September 12 and interviewed Gunn on September 16. Before Markel could interview Gunn's co-plaintiff Robin Hall ("Hall"), Turner threatened Hall not to get involved with Fields and the other women complaining of sexual harassment. Hall reported Turner's intimidation to Markel.

In October, Markel concluded that Parker and Turner violated IDOC's sexual harassment policy by their conduct directed toward Gunn and others and that Turner violated other IDOC policies as well, including a standard of conduct that forbid interfering with an investigation by intimidating witnesses. Markel further recommended that Parker and Turner receive additional training on sexual harassment

Parker and Turner went before the Employee Review Board ("ERB"), and the hearing officer recommended that Shawnee's warden suspend both employees. The warden issued Parker a one-day suspension, which was reduced to a written reprimand after he grieved the

action.  The warden issued Turner a five-day suspension, which was reduced to a one-day suspension after he grieved the action.  Neither Parker nor Turner received additional training on sexual harassment beyond the yearly training already provided.

      D.     <u>Post-Complaint Treatment</u>

In the fall of 2002 after Markel's investigation, Qualls assigned Gunn to work in the control room of the segregation housing area, which Gunn viewed as an attempt to punish her because she was confined for eight hours to a small room by herself where there was no activity on the midnight shift.  Gunn did not mind the assignment other than that it was boring and too easy.  Male officers were also assigned to the segregation housing area on midnight shift.

On November 11, 2002, Parker wrote an incident report stating that Gunn was not alert on her assignment in the health care unit.  At the time, there were no inmates in the health care unit and Gunn had a headache, so she was sitting in a chair, leaning against a wall with her eyes closed.  She heard Parker's keys jingling from at least 20 feet away when he entered the area, opened her eyes and had a brief conversation with him about a training exercise.  Although Parker issued Gunn an incident report, Turner viewed dozing off on the job as not being serious enough to warrant a report.  Indeed, Parker had caught other correctional officers, including correctional officer Phillip Bailey, sleeping and did not write them up.  Gunn had an ERB hearing in which a written reprimand was recommended because it was her first offense.  The warden issued a three-day suspension instead, but that was reduced to a written reprimand after Gunn grieved the matter.

On November 25, Turner conducted Gunn's annual performance evaluation and found that she "me[t] expectations" in all categories except one and that she "need[ed] improvement"

in the "use of time" category.  Gunn believed that she should have been found to have "exceed[ed] expectations" in several categories.  She also complained to Turner that the standard procedure was that an employee should not be marked as "needs improvement" unless she has been counseled about the problem, placed on "proof status," that is, was required to submit a doctor's note for medical absences, and had all grievances over the matter resolved.  In response, Turner counseled her on the spot and refused to change his "needs improvement" finding.  Gunn grieved this finding, and it was ultimately changed to "meets expectations" since Gunn had never been on "proof status."  Gunn's evaluation played no role in determining the amount of her yearly pay raise, which is determined solely by a collective bargaining agreement.

On December 25, Gunn gave an inmate's confidential medical file to another inmate to carry to a nearby departing bus, which violates IDOC regulations.  She did this at the direction of a nurse in the health care unit because she could not leave her post and the records needed to be taken to the bus.  Captain Quigly ("Quigley") referred Gunn for discipline, and she had an ERB hearing in which a written reprimand was recommended.  The warden concurred, but the discipline was reduced to a verbal reprimand after Gunn grieved the matter.  The nurse was not disciplined.  Gunn does not believe Quigley's actions were retaliatory.

Parker filed an incident report stating that on January 21, 2003, he had seen Gunn "not alert" at her post because she was playing cards with a nurse in the health care while on duty.  She was actually not playing cards at that time, but admitted that she had played cards while on duty earlier in the evening.  Gunn again had an ERB hearing in which a five-day suspension was recommended.  The warden concurred, but after Gunn grieved the issue, the discipline was reduced to a one-day suspension.  The warden was aware at the time that Gunn suspected Parker

10

was retaliating against her and told Gunn that she would keep Parker away from Gunn, but she did not follow through on this promise.

In early 2003, IDOC placed Gunn on involuntary medical leave from training to become certified as a TACT team member due to her pregnancy. This occurred after she had achieved 38 of the 40 hours required for certification, but as a consequence of the medical leave, she lost credit for the 38 hours she had already trained. Had she wanted to pursue certification after her medical leave, she would have been forced to start her 40-hour training over. Shelley Case, another female TACT team member who had not complained of sexual harassment, was not forced to take involuntary medical leave during her pregnancy, although she took voluntary medical leave.

In February or March of 2003, Gunn, who was still pregnant, was assigned to work as a relief officer on the 3 p.m. to 11 p.m. shift, where she was supervised by Captain Wild ("Wild"). Wild was aware of Gunn's sexual harassment allegations. He assigned Gunn to work in the kitchen to fill in while a kitchen officer was on vacation. Generally, Shawnee employees viewed kitchen assignments as punishment. Gunn believed that working in the kitchen was a particularly dangerous job because of the likelihood of slipping on a wet floor or of mass inmate disturbances and that a pregnant women should not have been assigned to such a job. Nevertheless, she never requested to be reassigned.

As a relief officer, Gunn was also assigned to work on the inmate housing wings. Wild never assigned two other pregnant correctional officers who did not complain of sexual harassment, Shelley Case and Monica Quigley, to the kitchen or inmate housing wings during their pregnancies. After fellow correctional officers complained about Gunn's working those

assignments, Wild stopped assigning her there as well.

Wild also assigned Gunn to work at the gatehouse at Shawnee's entrance without ensuring that she knew how to and was able to work that position. For example, regulations prohibited Gunn from patting down male visitors to the prisons, but Wild did not provide a male correctional officer to do those patdowns. As a consequence, Gunn allowed someone into the prison grounds with contraband. Gunn was not disciplined for the incident.

In May 2003, J.C., the subordinate female officer with whom Parker had a relationship, was seen on the prison grounds watching a DVD on a DVD player, which is contraband. She also had contraband rollerblades on the prison grounds at one time. Captain Qualls told her to take the contraband out of the facility but did not issue her any discipline for having the contraband or for not being alert at her post.

On October 10, 2004, Parker refused to approve 15 minutes of overtime Gunn worked. Gunn was working in the segregation housing area on the 3 p.m. to 11 p.m. shift and the person who was to take over for her on the next shift was late. Another correctional officer volunteered to take her assignment until the next correctional officer arrived, but Gunn declined the offer, fearing she would get in trouble with Parker. Gunn ended up working past the end of her shift, and Parker did not approve overtime pay. Other officers' overtime was routinely approved and paid.

At some point, the warden refused to investigate an incident report in which correctional officer Monica Quigley ("C/O Quigley"), a friend of Fields and Gunn, reported that she was afraid because another female correctional officer had expressed doubts about being able to come to her aid in a prison emergency. The warden also failed to respond C/O Quigley's

subsequent incident report complaining of his failure to address her first incident report.

The EEOC issued Gunn a right to sue letter, and in December 2003 she, along with three other female IDOC employees, timely filed this lawsuit. In December 2005, the plaintiffs amended the complaint to allege claims of sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) (Count I), and retaliation for complaining to their supervisors of that sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count II).[5]

**III.    Analysis**[6]

Title VII prohibits discrimination on the basis of sex: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). It also prohibits retaliation for reporting sex discrimination: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . .

---

[5]Gunn does not join in Count III, a claim for retaliation against a co-plaintiff.

[6]The Court is dismayed by the disorganization of the plaintiff's brief, despite her having been given a second chance at formulating an appropriate brief. Nevertheless, the Court has bent over backwards to do justice to the parties in this case by deciphering the plaintiff's confusing and sometimes illogical arguments. The Court reminds the plaintiff that it is not its job to do counsel's work of organizing or formulating a party's arguments, *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999), nor is it the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). To the extent that the Court has been unable to detect an argument intended to be advanced by the plaintiff, the Court finds that the argument is waived because it was not properly supported. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Court will address each of Gunn's three Title VII theories in turn.

A.      Sex Discrimination other than Sexual Harassment

It appears that Gunn is alleging that she was treated differently because of her sex in ways other than being exposed to a hostile environment.  Although her complaint is not very specific about how she believes she was treated differently because of her sex, her response to IDOC's summary judgment motion indicates that she may believe she was treated differently than men (1) when she was assigned to work in the kitchen and on the wings, (2) when she was issued a written reprimand for not being alert on November 11, 2002, and (3) when she was suspended for one day for playing cards on January 21, 2003.

To withstand a motion for summary judgment on this type of disparate treatment sex discrimination claim, a Title VII plaintiff may present direct proof of discrimination through direct or circumstantial evidence.  *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001);  *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).  A plaintiff may also proceed using the burden shifting mechanism outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Gunn argues that she can establish sex discrimination through both the direct and indirect methods.

1.      Direct Method

Under the direct method of proving discrimination, the plaintiff may rely on direct evidence of an acknowledgment of discriminatory intent or on circumstantial evidence sufficient

14

to provide a basis for inferring intentional discrimination motivated an adverse employment action.  *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)).  Historically, direct evidence has been viewed as evidence that is within a witness's personal knowledge and does not require drawing an inference to support the proposition for which it is offered, and circumstantial evidence has been viewed as evidence requiring such an inference.  *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).  This distinction is vague and irrelevant;  any evidence supporting a finding of discrimination is sufficient to withstand summary judgment under the direct method.  *Id.*

Gunn has not offered any direct or circumstantial evidence that she was treated differently in the three aforementioned situations because she is a woman.  As for her job assignments, it is undisputed that men were also assigned to work in the kitchen and on the wings.  As for her discipline for failing to be alert, the only evidence Gunn points to is the fact that she was written up when others, both male and female, were not.  This does not suggest sex discrimination.  Finally, as for her discipline for playing cards, Gunn has offered no admissible evidence that males played cards and were not disciplined.  Because Gunn has not offered any direct or circumstantial evidence of discrimination, she must proceed under the *McDonnell Douglas* approach.

2.    *McDonnell-Douglas* Indirect Method

Under this approach, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she

was treated less favorably than others not in the protected class who were similarly situated.
*Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003).  A plaintiff's successful
demonstration of each of these elements creates a rebuttable presumption of discrimination.
*Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003**)**.  The burden of production then
shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  If
the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff
to show that the articulated reason is actually a pretext.  *Id.*  At the pretext stage, the plaintiff
need not provide evidence of the defendant's discriminatory motive so long as he provides
evidence from which a reasonable trier of fact could find that the proffered reason was not
genuine, that is, was a lie.  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006);
*Allen v. Chicago Transit Auth.*, 317 F.3d 696, 699 (7th Cir. 2003) (citing *Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000)).  It is important to note that the ultimate
burden of persuasion remains at all times with the plaintiff.  *Reeves*, 530 U.S. at 143 (citing
*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

        In this case, Gunn cannot establish a *prima facie* case of sex discrimination under the
*McDonnell-Douglas* burden-shifting scheme.  As noted in the previous section, Gunn has failed
to present any admissible evidence that any similarly situated male was treated better in their job
assignments or their discipline for card-playing.  To be similarly situated, an employee must be
"directly comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.*, 281 F.3d
676, 680 (7th Cir. 2002).  Those "material respects" depend on the specific situation involved in
the case and may include whether the employees dealt with the same supervisor, were subject to
the same standards, or had comparable experience, education and qualifications, if the employer

took these factors into account when making the personnel decision in question.  *Id.*  Gunn has

offered no evidence that any male similarly situated to her in all relevant respects was treated

better than she was with respect to job assignments or discipline for playing cards.

Furthermore, Gunn has not established an adverse employment action that resulted from

her not being alert on November 11, 2002.  In order to establish an adverse employment action

as that phrase is understood in the Title VII context, a plaintiff must show a "quantitative or

qualitative change in the terms or conditions of [her] employment that is more than a mere

subjective preference."  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003);  *see*

*Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002).  Neither a negative

evaluation nor a written or oral warning, in the absence of some tangible job consequence,

qualifies as an adverse employment action that is actionable under Title VII.  *Whittaker v.*

*Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 2986 (2006);

*Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001).  Gunn has not shown

any tangible job consequence that accompanied her reprimand for not being alert on the job on

November 11, 2002.

To the extent that Gunn complains that other conduct was motivated by her sex, the

Court finds, as discussed later in this order, that the evidence strongly suggests that such conduct

was meant as retaliation for her complaints about sexual harassment and was not based on any

animus against women.  *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 809 (7th Cir. 2001)

(noting that an employer's conduct motivated by the plaintiff's filing of a sexual harassment

complaint and not by plaintiff's gender must be argued as a retaliation claim).

For these reasons, the Court finds that there is no genuine issue of material fact and

17

IDOC is entitled to judgment as a matter of law on Gunn's sex discrimination claims other than her hostile environment sexual harassment claims.

      B.    <u>Sexual Harassment</u>

The sex discrimination prohibited by Title VII includes sexual harassment that is so severe or pervasive that it alters the condition of the victim's employment and creates an abusive working environment even where there is no tangible employment action. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Courts generally refer to these types of cases as "hostile environment" cases. The Court views Gunn's claim as such a case and not as a *quid pro quo* sexual harassment case (to the extent that those labels are helpful in sexual harassment cases) because Gunn has not provided evidence of a tangible employment action resulting from the sexual harassment.

In this case there is no evidence of a tangible employment action taken as a consequence of sexual harassment. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Gunn points to her undesirable job assignments and her disciplinary suspension as proof of a tangible employment action. However, as noted before, the evidence suggests that those actions were in retaliation for complaining of sexual harassment; no evidence supports the inference that those actions were taken because she failed to acquiesce to the sexual harassment. There is simply no evidence that either Parker's or Turner's sexual harassment affected the tangible aspects of Gunn's job because she did not acquiesce to their harassment. Thus, the Court treats Gunn's sexual harassment claim as a

18

hostile environment claim.

In order to establish such a hostile environment sexual harassment claim, a plaintiff must show,

> (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability.

*Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).

In this case, IDOC does not seriously contest that the conduct to which Gunn was subjected was unwelcome. It does argue, however, that it was not based on sex, that it was not severe or pervasive enough to create a hostile environment, and that there is no basis to hold IDOC liable.

      1.   <u>Based on Sex</u>

A reasonable jury could find that the sexual harassment to which Gunn was subjected was based on her sex. IDOC argues that Parker's numerous comments about Gunn's rear end were gender-neutral and that he made a similar comment to a male correctional officer. The Court is hard-pressed to believe, however, that Parker's comments about Gunn's anatomy had nothing to do with the fact that she is a woman. The Court also believes a reasonable jury could find that even Parker's one comment to the male officer regarding the size of his rear end could actually have been intended as an indirect, derogatory comment about Gunn. Furthermore, it is beyond question that Parker's other comments to Gunn and all of Turner's conduct was based on Gunn's sex. Thus, considering all the circumstances, the Court believes a reasonable jury could find that the harassing conduct at issue in this case was directed toward Gunn because she is a woman.

19

2.     Hostile Environment

The Court concludes that Gunn has presented enough evidence from which a reasonable

jury could find that she was subject to an actionable hostile environment.  A hostile work

environment is created by conduct that has "the purpose or effect of unreasonably interfering

with an individual's work performance or creating an intimidating, hostile, or offensive working

environment."  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986);  *accord Cooke v. Stefani*

*Mgmt. Servs.*, 250 F.3d 564, 566 (7th Cir. 2001).  Sexual harassment that creates a hostile work

environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the

conditions of [the victim's] employment and create an abusive working environment.'"

*Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor*, 477 U.S. at 67)

(further internal quotations omitted); *see also Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 270

(2001) (*per curiam*); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).  "Harassment

need not be severe *and* pervasive to impose liability;  one or the other will do."  *Hostetler v.*

*Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

Whether an environment is objectively sufficiently hostile or abusive must be judged by

"'looking at all the circumstances,' including the 'frequency of the discriminatory conduct;  its

severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and

whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S.

at 787-788 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)) (further internal quotations

omitted); *accord Breeden*, 532 U.S. at 270-71; *Murray v. Chicago Transit Auth.*, 252 F.3d 880,

888-89 (7th Cir. 2001).  Courts "should not carve up the incidents of harassment and then

separately analyze each incident, by itself, to see if each rises to the level of being severe or

20

pervasive." *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Breeden*, 532 U.S. at 271. For example, a court has found that "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998). On the other hand, an uninvited kiss and an attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim. *Hostetler*, 218 F.3d at 807-08.

In addition, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke*, 250 F.3d at 566-67 (citing *Harris*, 510 U.S. at 21-22); *accord Murray*, 252 F.3d at 889.

This is a close case, but considering all the circumstances the Court must conclude that Gunn has presented enough evidence from which a reasonable jury could find that she was subject to a work environment that was subjectively and objectively hostile. While Parker's and Turner's behavior mostly consisted of relatively innocuous and non-threatening offensive utterances, they were frequent. In addition, Parker's comments about Gunn's rear end were particularly humiliating, especially the comment that occurred in front of the entire TACT team; a female employee's having her rear end pointed out to her male colleagues is extremely

21

embarrassing.  The one instance of unwelcome touching when Parker unhooked her bra was also humiliating.  Furthermore, the conduct that occurred in the presence of Gunn's coworkers was likely to make it more difficult for her to be viewed as a professional colleague and therefore more difficult for her to do her job.  This conduct may be sufficient to establish that Gunn's working environment was objectively hostile.  In addition, although Gunn did not report Parker's and Turner's behavior to anyone at the time, the evidence establishes that she was subjectively offended by it and repeatedly requested them to stop.

As noted above, this is a close case.  However, after considering the frequency of Parker's and Turner's more innocuous sexual conduct and the one instance of physical contact, the Court concludes that such conduct, when taken all together, could be sufficiently severe or pervasive to alter Gunn's terms and conditions of employment.

In making its decision, the Court did not consider the incidents Gunn did not know about at the time.  "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."  *Mason*, 233 F.3d at 1046.  Thus, the Court cannot consider the betting pool about sleeping with new employees, the comments about female correctional officers' attractiveness or sexual jokes outside Gunn's presence, the "fresh meat" comment or any other incident about which Gunn did not know.

3.    Employer Liability

The Court finds that IDOC cannot be liable for the sexually harassing hostile environment experienced by Gunn.  The standards applicable to the question of whether an employer is liable for a hostile work environment depend on whether the harassment was caused

by the victim's supervisor or a coworker. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).

Generally, employers are vicariously liable for an actionable hostile environment created by a supervisor with authority over the victimized employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000). If the harassment culminated in tangible employment action against the employee, the employer is strictly liable for the supervisor's acts. *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 760-61; *Rhodes*, 359 F.3d at 505. However, if the supervisor did not take any tangible employment action against the employee, as it did not in this case, the employer may raise an affirmative defense to liability or damages. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Rhodes*, 359 F.3d at 505-06. To succeed in its affirmative defense, the employer must show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Molnar*, 229 F.3d at 600.

If, on the other hand, the actionable hostile work environment was created by a coworker as opposed to a supervisor, a plaintiff must show that the employer was negligent in discovering or remedying the harassment. *Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407 (7th Cir. 2005); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). An employer can escape liability by showing that its response to the possibility of harassment was timely and reasonably likely to prevent the harassment. *Parkins*, 163 F.3d at 1032; *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). Furthermore, the employer's actions

are not required to *actually* prevent further harassment, as long as it was *reasonably likely* to prevent future harassment. *Parkins*, 163 F.3d at 1035; *Saxton*, F.3d at 536.

a.   <u>Supervisor or Coworker</u>

Gunn contends that Parker and Turner were her supervisors because, as lieutenants, they outranked her, a correctional officer. If this is true, IDOC would be vicariously liable for Parker's and Turner's harassment of Gunn unless IDOC can establish the *Faragher/Ellerth* affirmative defense. On the other side, IDOC argues that Parker and Turner were mere coworkers because they did not have the authority to hire, fire, promote, demote, transfer or discipline correctional officers like Gunn. If this is true, IDOC would only be liable if it was negligent in discovering or remedying the harassment of Gunn.

For Title VII purposes, a supervisor is someone with the power to directly affect the terms and conditions of the specific plaintiff's employment, not just an employee with some kind of managerial authority. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). Supervisory authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee," and in the absence of at least some of this authority, an employee is not a supervisor for Title VII purposes. *Hall*, 276 F.3d at 355 (citing *Parkins v. Civil Constructors of Ill., Inc*., 163 F.3d 1027, 1034 (7th Cir. 1998)). It does not include "an employee merely having authority to oversee aspects of another employee's job performance." *Rhodes*, 359 F.3d at 506. For example, in *Hall* a harasser was found not to be an employee's supervisor where he directed her work operations, had input into her performance evaluations and trained her. *Hall*, 276 F.3d at 355. On the other hand, a harasser was found to be a supervisor for Title VII purposes where he did not have the

24

authority to make hiring, firing, promotion or disciplinary decisions about the victim but occasionally acted as her commanding officer and had the ability to initiate disciplinary proceedings against her.  *See Gawley v. Indiana Univ.*, 276 F.3d 301, 310-11 (7th Cir. 2001).

This, also, is a close call.  Gunn has presented no evidence of IDOC's hierarchical structure or chain of command showing that lieutenants, simply because of their rank, have supervisory authority over all correctional officers as that authority is understood in the Title VII context.  She has also not presented any evidence that Parker or Turner in particular had any authority from IDOC to give her orders or work assignments or to in any other way direct her work activities.  IDOC, on the other hand, has established by uncontested evidence that neither Parker nor Turner had the authority to hire, fire, promote or discipline Gunn.

Despite the dearth of evidence discussed by Gunn in relation to this issue, the Court has been able to glean from other portions of the briefing that Parker and Turner did exercise some authority directly over Gunn.  The evidence shows that Parker had the power to initiate disciplinary proceedings against Gunn and to approve or disapprove pay for her overtime work and that Turner had the power to conduct annual performance evaluations of Gunn.  The Court gives special weight to evidence of Parker's ability to disapprove overtime pay, which is in essence the ability to effect her rate of pay.  In combination with Parker's and Turner's ability to initiate discipline and conduct performance reviews, this is sufficient for a reasonable jury to conclude that they had a direct effect on the terms and conditions of her employment and were therefore supervisors for Title VII purposes.  Thus, IDOC may be vicariously liable for their actions unless it can establish the *Faragher/Ellerth* affirmative defense.

b.     <u>Affirmative Defense</u>

As noted earlier, an employer will not be liable for the harassing environment created by its supervisors if it did not take a tangible employment action and if it can establish (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).

i.     IDOC's Reasonable Care

IDOC has met its burden of showing that it exercised reasonable care to prevent and correct promptly sexually harassing behavior about which it knew.  It is true that having a sexual harassment policy is not enough, by itself, to establish the first element of the *Faragher/Ellerth* defense.  *Cerros v. Steel Techs., Inc*., 398 F.3d 944, 953 (7th Cir. 2005).  The promulgation and use of a policy can, however, show that an employer took reasonable care to prevent sexual harassment.  *Id.*;  *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999).

In this case, it is apparent that IDOC took reasonable care to prevent sexual harassment. It had a sexual harassment policy that forbid a broad range of sexually harassing conduct and offered the victim of such conduct multiple channels to report policy offenders.  IDOC trained new employees about the policy and conducted refresher training for all employees annually. That not all employees followed the policy's requirement to refrain from and to report sexual harassment does not diminish the adequacy of IDOC's prevention efforts.

Whether an employer acted promptly to try to correct sexual harassment and prevent it from occurring again is another question.  "An employer's response to alleged instances of

26

employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996).  If an employer takes prompt and appropriate corrective action, it can avoid liability for its employees sexual harassment.  *Cerros*, 398 F.3d at 954.

The evidence shows that when IDOC learned of sexual harassment, it promptly attempted to correct that harassment.  When co-defendant Linda Fields used the complaint procedure established by the policy to report sexual harassment, IDOC promptly investigated her claims (as well as others such as Gunn's that had come to light during that investigation) and disciplined the offenders, Parker and Turner.  That the discipline was not as harsh as Gunn might have liked does not render IDOC's response inappropriate.

Finally, IDOC has established that, on balance, its response to Gunn's report of sexual harassment was reasonably calculated to prevent further harassment.  The Court is given pause by IDOC's decision to allow Turner to conduct Gunn's annual review in November 2002, a little over a month after she  reported sexual harassment in an incident report and after Markel submitted his investigation report in October 2002.  Allowing an accused harasser to review the job performance of the accuser does not seem like a good way to prevent further harassment. However, despite these misgivings, the Court finds that the effectiveness of IDOC's response is undisputed.  The evidence shows that Gunn had no complaints about sexual harassment after IDOC investigated and disciplined Parker and Turner (although she did have a problem with their retaliatory conduct).

In sum, IDOC has established that it was reasonable in its efforts to prevent and correct

sexual harassment.

ii. <u>Gunn's Reporting</u>

IDOC has also established that Gunn unreasonably failed to report Parker's and Turner's offensive conduct.  The requirement that an employee report sexually harassing conduct arises out of her duty to take reasonable care to avoid harm.  *Faragher*, 524 U.S. at 806;  *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005).  "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists."  *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998) (quotations omitted).

In this case, the evidence shows that IDOC maintained an internal complaint procedure for employees to complain of sexual harassment and that Gunn declined to use this procedure until she was ordered to do so.  Gunn points to the policy's alternative of proceeding directly to the EEOC without filing an internal complaint as evidence that she technically complied with the policy.  However, technical compliance is not the critical issue.  The question is whether she unreasonably failed to use measures available to her to try to stop the harassment.  The evidence is clear that she failed to use those measures – whether they be an internal complaint or an EEOC charge –  in a timely manner to attempt to give IDOC notice of the harassment and to give it an opportunity to stop it.  To the extent that Gunn may argue that she was afraid of retaliation if she reported the harassment, that fear does not relieve her of her responsibility to report the harassment.  *See Hill v. American Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) ("apprehension does not eliminate the requirement that the employee report harassment:  an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the

28

employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment."
(quotations omitted)).  In the circumstances in the record, Gunn's failure to use IDOC's internal
complaint procedure was unreasonable.

Even viewing the facts and making all reasonable inferences in Gunn's favor, the Court
concludes that no reasonable jury could find IDOC liable for Gunn's sexually hostile work
environment.  For this reason, the Court will grant summary judgment for IDOC on Gunn's
claim of sex discrimination through a sexually harassing hostile environment.

C.    <u>Retaliation</u>

Gunn alleges that IDOC retaliated against her after she complained of sexual harassment.
IDOC is not entitled to summary judgment on this claim.

To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an
indirect, burden-shifting method.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir.
2004); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of
Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Under the direct method, the
plaintiff must present evidence, either direct or circumstantial, of a causal connection between a
statutorily protected activity and an adverse action taken by the employer.  *Rhodes*, 359 F.3d at
508; *Stone*, 281 F.3d at 644.  The Court need not review the *McDonnell-Douglas* burden-shifting
mechanism as it applies to retaliation claims because it finds that Gunn can withstand summary
judgment using the direct method.

IDOC argues that Gunn cannot succeed on her retaliation claim because she cannot point
to an adverse action she suffered.  Gunn, on the other hand, points to a number of events she
believes were in retaliation for her sexual harassment complaints:  her undesirable job

assignments, her being written up by Parker for not being alert when others caught not being alert were not, her unwarranted negative performance review from Turner, her being written up by Parker for playing cards when he did not actually see her playing cards, her involuntary removal from the TACT team and forfeiture of 38 hours of training, her assignment to the gatehouse without proper training or assistance and Parker's refusal to approve her overtime when other officer's overtime was routinely approved.

While what constitutes an adverse action in the Title VII retaliation context has engendered much confusion among the Courts of Appeals, the Supreme Court has recently clarified the appropriate standard in *Burlington Northern & Santa Fe Railway Company v. White,* 126 S. Ct. 2405, 2410-11 (2006). In *White,* the Supreme Court held that the adverse action necessary for a retaliation case did not need to affect the terms and conditions of an employee's employment and did not even need to occur at the workplace. *Id.* at 2409, 2414. Instead, it held that a successful Title VII retaliation plaintiff must only establish an "employer action[] that would have been materially adverse to a reasonable employee." *Id.* at 2409. In cases like *White,* actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" would qualify. *Id.* A similar standard would apply where adverse action is allegedly in retaliation for complaining of sexual harassment.

In this case, a reasonable jury could find that the actions Gunn believes were in retaliation for her sexual harassment complaints were harmful to the point that they would dissuade a reasonable correctional officer in Gunn's position from complaining of sexual harassment. The Court also finds that Gunn has presented sufficient evidence from which a

30

reasonable jury could infer a causal connection between those actions and her report of sexual harassment.  Within a short time after her complaints, a series of unwarranted actions and disparate treatments began.  The fact that these events began shortly after her complaints and did not seem to occur to others who had not complained is enough to lead a reasonable jury to conclude that they were causally related to her complaints.

For these reasons, the Court must deny IDOC's motion for summary judgment on Gunn's retaliation claim.

**IV.     Conclusion**

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** IDOC's motion (Doc. 31).  The motion is **GRANTED** to the extent that it seeks dismissal of Count I, Gunn's sex discrimination and sexual harassment claims, and the motion is **DENIED** to the extent that it seeks dismissal of Count II, Gunn's retaliation claim.  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**Dated:  September 12, 2006**

s/ J. Phil Gilbert
**J. Phil Gilbert, U.S. District Judge**

31