IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LINDA FIELDS, PAM GUNN, ROBIN HALL, AND YEVETTE HAMILTON, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 03-cv- 4222-JPG |
| | ) | |
| THE ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendant Illinois Department of Corrections ("IDOC") as to the claims in this case raised by

plaintiff Robin Hall ("Hall") (Doc. 34).[1]  Hall has responded to the motion (Doc. 61) and IDOC

has replied to that response (Doc. 73).  In this case, Hall alleges that IDOC, her former employer,

is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., for sex

discrimination, for sexual harassment and for retaliation because she complained of that

harassment.[2]  IDOC contends that Hall cannot establish a case of discrimination, sexual

---

[1]The Court notes that IDOC filed four separate summary judgment motions in this case, one addressed to each plaintiff's claims.  In ruling on each of the motions, the Court has been careful to confine its consideration to the evidence presented in connection with that particular motion and not to other evidence presented in connection with the other three motions, even if such other evidence would have been relevant to the motion at hand.  To the extent that the Court's rulings are inconsistent, that inconsistency is a product of the different evidence presented by the parties in connection with each motion and not by an improper application of the law.

[2]The Court construes this case as not asserting a "pattern-or-practice" Title VII cause of action.  Although the plaintiff's response to the summary judgment motion referred in passing to a "pattern-or-practice" theory, it analyzes this case as if it only asserted individual claims, confirming that she does not intend to assert such a claim.

harassment or retaliation and, if she can establish a sexual harassment case, it is entitled to assert an affirmative defense.

## I.     Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.  This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion.  *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita*

2

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.   Facts

Taken in the light most favorable to Hall, the evidence establishes the following facts.[3]

### A.   IDOC's Sexual Harassment Policy

Hall, a woman, worked as a correctional officer at Shawnee Correctional Center ("Shawnee") from January 5, 1998, to November 4, 2002.  At all relevant times, IDOC had a written sexual harassment policy, Administrative Directive ("AD") 03.01.310.  As of December 1, 2002, that policy provided that sexual harassment included "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  A.D. 03.01.310 § II.E.  The policy specifically noted that sexual harassment included

> Verbal conduct such as sexual innuendos, suggestive comments, insults, humor, or jokes about sex, anatomy, or gender-specific traits, sexual propositions, threats, repeated requests for dates, or statements about other employees, even outside their presence, of a sexual nature,

*Id.* at § II.F.1.d., and

> Physical conduct such as unwelcome hugging, touching, or kissing, pinching, brushing the body, coerced sexual acts, or actual assaults,

---

[3]The Court has omitted several alleged "facts" because they are supported only by hearsay, statements without personal knowledge, or otherwise inadmissible evidence.  In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial.  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

*Id.* at § II.F.1.g.  The policy forbid engaging in or condoning sexual harassment, and obligated supervisors to "address[] an observed or reported incident of sexual harassment as a serious form of employee misconduct."  *Id.* at § II.G.  It also required employees who witnessed or were aware of sexual harassment to report it in an incident report.  *Id.* at § II.G.3.  The policy also forbid retaliation against an employee who alleged sexual harassment in good faith.  *Id.* at § II.K.

The internal sexual harassment reporting policy in AD 03.01.310 required an employee who believed she was being harassed to notify her supervisor and document the incident with an incident report, to notify the next person in the chain-of-command if the supervisor was the harasser and document the incident with an incident report, or to notify IDOC's Office of Affirmative Action.  *Id.* at § II.H.2.  The IDOC employee receiving the report was then required to notify the warden of the facility, who was then required to notify the Office of Affirmative Action and to review and respond to the allegations within five working days, which may have included referring the matter for a formal investigation.  *Id.* at § II.H.4. & 6.  If it was determined that sexual harassment occurred, the warden was required to take "prompt, appropriate corrective action, including discipline, lockout, or other similar measures."  *Id.* at § II.H.8.c.  Although the policy urged employees to use the internal complaint process to obtain a resolution to sexual harassment complaints, it also allowed an employee to proceed directly to the Illinois Department of Human Rights or the Equal Employment Opportunity Commission ("EEOC").  *Id.* at § II.F.7.

Before beginning to work at Shawnee, Hall received a copy of and read IDOC's sexual harassment policy.  In addition, she and other IDOC employees were trained yearly about sexual harassment, but IDOC was not rigorous about its training.  The training consisted of flippantly

4

giving out a copy of the sexual harassment policy with the instructions, "Read it.  You guys

know what this is," and taking a test.  Nevertheless, Hall was aware that she could report sexual

harassment to several different people under the internal reporting procedures.

      B.    <u>Hall's Employment</u>

      While at Shawnee, Hall often worked with Lieutenant Kerry Parker ("Parker"), a male.

Parker often told jokes of a sexual nature and made off-color comments in Hall's presence.  One

time Parker made sexual comments and used vulgarity in describing body parts to another

female officer in the control room in Hall's presence in a situation where she could not leave the

area.  Hall limited her comments to Parker to strictly professional matters and would not respond

to Parker's sexual talk but also did not report any of his comments at the time he made them.

      After it became apparent that Hall was not going to engage in sexual banter with Parker,

she was assigned to kitchen duty for an entire year, well beyond the normal 90-day rotation.

IDOC employees at Shawnee, including Lieutenant Paul Turner ("Turner"), generally thought

that women correctional officers were assigned to kitchen duty as punishment and, indeed,

Captain Wild told Hall she had been assigned to work in the kitchen as punishment.  Hall and

several others at Shawnee believed her kitchen assignment was punishment for not flirting or

engaging in sexual banter with Parker.  Indeed, female correctional officers who responded

favorably to Parker's sexual banter and reciprocated his flirtations were not assigned to the

kitchen and instead received the plum job assignments, while other female employees who

refused to respond to male officers' sexual comments, including correctional officers Carmen

Adams and co-plaintiff Linda Fields ("Fields"), were assigned to the kitchen.  Males were also

assigned to work in the kitchen.

At the time, Captain Qualls ("Qualls") and Captain Hoepker ("Hoepker"), not Parker, were responsible for making correctional officers' job assignments, although Parker claimed to be responsible for keeping Hall in the kitchen, and others told Hall that Parker referred to her as his "little kitchen girl."  Hall's pay and benefits were not reduced as a result of her kitchen duty, and she did not mind the actual work assignment as much as she resented feeling like she was being punished for an extended period of time.  Turner was aware of Hall's belief that her kitchen assignment was because someone did not like her, but he did not know who that "someone" was and never initiated any investigation into the matter.

One time in 2001 or 2002 while Hall was assigned to the kitchen, Qualls asked her in front of four or five male correctional officers and several inmates whether he could pay her to strip at a friend's birthday party.  Humiliated, Hall immediately left the area without responding to Qualls's question.  At some other time, Qualls asked Hall if she wore thong underwear.  She did not report either incident at that time.

In addition, Turner once told Hall that he liked her new uniform because it made her breasts look bigger.  Hall did not report that comment.

Hoepker once commented to Hall in front of the entire shift of workers that her hair looked nice and that she must have come from or must be later going on a date.  Hall did not respond to or report Hoepker's comment.

Another time Hall requested Hoepker approve a day of leave for her, but a fellow correctional officer requested a personal day off solely for the purpose of making the day unavailable for Hall to take as leave.  The officer was present and laughing when Hoepker called to tell Hall she could not have her requested day off.  Later Hoepker told her with respect to his

approving her leave requests, "If I see you in a skirt it might help you get time off." Hall did not report this comment at that time either.

The sexual harassment Hall alleges did not include any instances of physical touching. She did not report any of the harassment at the time because she thought reporting it would do no good.

In addition to the aforementioned conduct, IDOC employees exhibited objectionable conduct not aimed directly at Hall as well. For example, while working in the gatehouse, Hall saw lieutenants and correctional officers, including Parker on at least one occasion in 1999 or 2000, review the pictures of incoming female guards, comment on their attractiveness, and bet with each other about how long it would take them to sleep with the new employees. Co-plaintiff correctional officers Pamela Gunn ("Gunn") and Fields were subjects of one of these betting pools, and one IDOC employee once referred to Fields as "fresh meat." Hall heard these comments but did not report them at the time.

It was also not unusual for male correctional officers to talk about the physical attributes of female officers outside their presence. In addition, Parker and Turner would hear correctional officers making sexual comments or telling sexual jokes but would not object to them except, in Turner's case, if women were present. Turner never reported any violation of the sexual harassment policy.

Turner also asked Gunn at least 20 times from 2001 to mid to late 2002, in reference to her breasts, "When are you going to let me see those things?" or "When are you going to show me those titties?" and he asked her to unbutton the top button of her shirt for him when he was in a position to look down her shirt. In early 2002, Turner approached Fields in the officers' dining

7

room and asked her if her "titties" were getting bigger.  At some other time, after a female correctional officer had split her pants, Turner went around the prison reporting to other officers the color of the employee's underwear.

In addition, two lieutenants failed to report rumors that Parker had engaged in a consensual sexual relationship with a subordinate female officer ("J.C.") under his supervision while on duty at Shawnee, a violation of a standard of conduct, although one of those lieutenants did interview Parker about the rumor.  Parker admitted that he had a "personal relationship" with J.C. during work hours but did not specify further the nature of that relationship.  J.C. brought contraband roller blades on the prison grounds at one time.  Qualls told her to take the contraband out of the facility but did not issue her any discipline for having the contraband.

Neither Parker nor Turner had the authority to hire, fire, promote, or discipline Hall.

C.    Sexual Harassment Complaints and IDOC's Response

On September 8, 2002, Fields complained to Assistant Warden Windsor and submitted an incident report about the sexual harassment of herself and female employees at Shawnee in general as well as retaliation for failing to acquiesce in the sexual harassment.  In response to her report, IDOC directed Captain Homer Markel ("Markel"), an officer from another IDOC facility, to investigate sexual harassment at Shawnee.  He began the investigation on September 12 and interviewed Hall on September 16.  Before Markel could interview Hall, Turner, who was aware at the time that Hall was "having problems" with someone else at Shawnee, threatened Hall not to get involved with Fields and the other women complaining of sexual harassment.  Hall did not file an incident report about Turner's intimidation but reported it to Markel.

Markel concluded that Parker and Turner did not understand IDOC's sexual harassment

policy, that they had violated that policy by their conduct directed toward Hall and others and

that Turner violated other IDOC policies as well, including a standard of conduct that forbid

interfering with an investigation by intimidating witnesses.  Markel further recommended that

Parker and Turner receive additional training on sexual harassment.

Parker and Turner went before the Employee Review Board, and the warden ultimately

issued Parker a one-day suspension, which was reduced to a written reprimand after he grieved

the action.  The warden issued Turner a five-day suspension, which was reduced to a one-day

suspension after he grieved the action.  Neither Parker nor Turner received additional training on

sexual harassment beyond the routine training already provided.

D.    Post-Complaint Treatment

In late September 2002, about a week after Markel interviewed her, Hall was working in

the tower and Qualls tried to call her on her radio.  Unbeknownst to Hall, her radio had gone

dead, so Qualls got no response.  He then called her on the telephone to make sure nothing was

wrong.  Hall assured him that everything was fine, but Qualls sent Hoepker and another

correctional officer to the tower to check on her anyway.  This started false rumors around the

prison that Hall had been sleeping at her post and had to be woken up, which humiliated Hall.

As a consequence, Hall had to take a one-month leave of absence for stress, depression and

anxiety.

Prior to Markel's interview with Hall, Qualls approved her request for several days of

leave, but after the interview, several of her leave requests were denied.

In addition, after she spoke with Markel, some of Hall's fellow employees began to shun

her, telling her that they did not want to work with her or even eat lunch with her because she

was "on their list" and because "no one liked her."

On November 4, 2002, Hall resigned from her position with IDOC.  She was tired of "being on pins and needles, the isolation, the punishment, and then the feeling that there was no way it was going to get better because, if [she] complained, it was just going to be more retaliation."  Hall suffered from anxiety and depression, for which she took medication, and was afraid that her coworkers would retaliate against her by refusing to come to her aid in a prison emergency.

At some point, the warden refused to investigate an incident report in which correctional officer Monica Quigley ("Quigley"), a female friend of Fields and Gunn, reported that she was afraid because another female correctional officer had expressed doubts about being able to come to her aid in a prison emergency.  The warden also failed to respond Quigley's subsequent incident report complaining of his failure to address her first incident report.

On October 16, 2002, Hall signed a charge with the EEOC complaining of sex discrimination, sexual harassment and retaliation.  The EEOC received the charge on November 12, 2002.

The EEOC issued Hall a right to sue letter, and in December 2003 she, along with three other female IDOC employees, timely filed this lawsuit alleging claims of sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) (Count I), and retaliation for complaining to their supervisors of that sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count II).  In December 2005, the plaintiffs amended the complaint to allege an additional retaliation claim that does not involve Hall.

10

III.    **Analysis**[4]

Title VII prohibits discrimination on the basis of sex:  "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  It also prohibits retaliation for reporting sex discrimination:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

The Court will address each of Hall's three Title VII theories in turn.

A.    <u>Sex Discrimination other than Hostile Environment</u>

It appears that Hall is alleging that she was treated differently because of her sex in ways other than being exposed to a hostile environment.  To withstand a motion for summary judgment on this type of disparate treatment sex discrimination claim, a Title VII plaintiff may

---

[4]The Court is dismayed by the disorganization of the plaintiff's brief, despite her having been given a second chance at formulating an appropriate brief.  Nevertheless, the Court has bent over backwards to do justice to the parties in this case by deciphering the plaintiff's confusing and sometimes illogical arguments.  The Court reminds the plaintiff that it is not its job to do counsel's work of organizing or formulating a party's arguments,  *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999), nor is it the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment."  *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  "Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  To the extent that the Court has been unable to detect an argument intended to be advanced by the plaintiff, the Court finds that the argument is waived because it was not properly supported.  *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000);  *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

present direct proof of discrimination through direct or circumstantial evidence. *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001); *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). A plaintiff may also proceed using the burden shifting mechanism outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the direct method of proving discrimination, the plaintiff may rely on direct evidence of an acknowledgment of discriminatory intent or on circumstantial evidence sufficient to provide a basis for inferring intentional discrimination as motivating the employer's adverse employment action. *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)). Historically, direct evidence has been viewed as evidence that is within a witness's personal knowledge and does not require drawing an inference to support the proposition for which it is offered, and circumstantial evidence has been viewed as evidence requiring such an inference. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). This distinction is vague and irrelevant; any evidence supporting a finding of discrimination is sufficient to withstand summary judgment under the direct method. *Id.*

Under the *McDonnell Douglas* indirect method, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she was treated less favorably than others not in the protected class who were similarly situated. *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003). A plaintiff's successful demonstration of each of these elements creates a rebuttable presumption of discrimination. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). The burden of

12

production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext.  *Id.*  At the pretext stage, the plaintiff need not provide evidence of the defendant's discriminatory motive so long as he provides evidence from which a reasonable trier of fact could find that the proffered reason was not genuine, that is, was a lie.  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006);  *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 699 (7th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000)).  It is important to note that the ultimate burden of persuasion remains at all times with the plaintiff.  *Reeves*, 530 U.S. at 143 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Hall argues that she can establish sex discrimination through both the direct and indirect methods.  IDOC, on the other hand, challenges Hall's ability to prove that she suffered an adverse employment action, a requirement for proceeding under either method.  *Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 611-12 (7th Cir. 2001).  It also contests her ability to show any similarly situated male employees who were treated better than she was, an essential element of the *prima facie* case under the *McDonnell Douglas* scheme.

## 1.   Adverse Employment Action

In order to establish an adverse employment action as that phrase is understood in the Title VII context, a plaintiff must show a "quantitative or qualitative change in the terms or conditions of [her] employment that is more than a mere subjective preference."  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003);  *see Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002).  Adverse employment actions generally fall into three

categories.

> (1) cases in which the employee's compensation, benefits or other financial terms
> of employment are diminished, including cases where employment is terminated;
> (2) cases in which a nominally lateral transfer without a change in financial terms
> significantly reduces the employee's career prospects by preventing him from
> using the skills in which he is trained and experienced; and (3) "[c]ases in which
> the employee is not moved to a different job or the skill requirements of his
> present job altered, but the *conditions* in which he works are changed in a way
> that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise
> significantly negative alteration in his workplace environment – an alteration that
> can fairly be characterized as objectively creating a hardship, the classic case
> being that of the employee whose desk is moved into a closet."

*Tart v. Illinois Power Co.*, 366 F.3d 461, 475-75 (7th Cir. 2004) (quoting *Herrnreiter*, 315 F.3d

at 744-45) (emphasis in original).  "Tangible employment actions are the means by which the

supervisor brings the official power of the enterprise to bear on subordinates.  A tangible

employment decision requires an official act of the enterprise, a company act." *Burlington*

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998).

However, "not everything that makes an employee unhappy is an actionable adverse

action.  Otherwise, minor and even trivial employment actions that an employee did not like

would form the basis of a discrimination suit." *Murray v. Chicago Transit Auth.*, 252 F.3d 880,

888 (7th Cir. 2001) (internal quotations, citations and ellipsis omitted).  Actions that do not

significantly affect a plaintiff's job responsibilities or benefits, or actions that cause mere

inconveniences, cannot be tangible employment actions.  *Id.*.

In this case, Hall has not shown any tangible job consequence she suffered because of her

sex.  There is no evidence that the financial terms of her employment or her career prospects

were affected or that the conditions in which she worked were altered to create an objective

hardship.  Hall points to her assignment to the kitchen, but admits that it was a task to which any

correctional officer could be expected to be assigned and, in fact, she did not mind the actual work itself.  Although the kitchen assignment may have been objectively unpleasant and may have been used as a punishment by superior officers, it was not such an objectively inferior job assignment that it constituted an adverse employment action.  An employee's "subjective preference for one position over another" where both positions are otherwise equivalent does not establish that assignment to the non-preferred position is an adverse employment action. *Herrnreiter*, 315 F.3d at 744-45.  Because Hall's assignment to the kitchen amounted to no more than a mere inconvenience and did not significantly alter her job responsibilities, it was not an actionable adverse employment action.

Because Hall cannot establish an adverse employment action, she cannot prevail on her claim of sex discrimination.  For this reason, the Court finds that there is no genuine issue of material fact and IDOC is entitled to summary judgment as a matter of law on Hall's sex discrimination claim other than her hostile environment claim.

B.   Sexual Harassment

The sex discrimination prohibited by Title VII includes sexual harassment that is so severe or pervasive that it alters the condition of the victim's employment and creates an abusive working environment even where there is no tangible employment action.  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).  Courts generally refer to these types of cases as "hostile environment" cases.  The Court views Hall's claim as such a case and not as a *quid pro quo* sexual harassment case (to the extent that those labels are helpful in sexual harassment cases) because Hall has not provided evidence of a tangible employment action resulting from the sexual harassment.  There is simply no evidence that the harassment Hall experienced affected

15

the tangible aspects of her job because she did not acquiesce to it or, as discussed in the previous section, that in any other way she was subject to a tangible employment action.  Thus, the Court treats Hall's sexual harassment claim as a hostile environment claim.

In this case, with respect to the question of whether Hall's work environment was an actionable hostile environment, IDOC argues that the conduct Hall describes was not severe or pervasive enough to be actionable and that there is no basis to hold IDOC liable.  Hall disagrees.

1.    Hostile Environment

The Court concludes that there is sufficient evidence for a reasonable jury to find that Hall was subject to an actionable hostile environment.  A hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)) (further internal quotations omitted); *see also*; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998);  *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003). "Harassment need not be severe *and* pervasive to impose liability;  one or the other will do." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

Whether an environment is objectively sufficiently hostile or abusive must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-788 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)) (further internal quotations omitted); *accord Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Murray v.*

16

*Chicago Transit Auth.*, 252 F.3d 880, 888-89 (7th Cir. 2001).  Courts "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive."  *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Breeden*, 532 U.S. at 271. For example, a court has found that "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998).  On the other hand, an uninvited kiss and an attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim.  *Hostetler*, 218 F.3d at 807-08.

In addition, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke v. Stefani Mgmt. Servs.*, 250 F.3d 564, 566-67 (7th Cir. 2001) (citing *Harris*, 510 U.S. at 21-22); *accord Murray*, 252 F.3d at 889.

This is a close case, but considering all the circumstances there is enough evidence from which a reasonable jury could find Hall was subject to a work environment that was subjectively and objectively hostile.  Although the comments of Parker, Turner, Qualls and Hoepker, all her superior officers, mostly consisted of relatively innocuous and non-threatening offensive

utterances, they were fairly frequent.  Hall describes Parker's comments in terms that imply an ongoing pattern of behavior rather than a few isolated comments, like those she attributes to Turner, Qualls and Hoepker.  In addition, Qualls's question to Hall about stripping was particularly humiliating because it was in front of her male coworkers and male inmates.  This comment likely made it more difficult for her coworkers to view her as a professional colleague and for the inmates to view her as an authority to be respected, and therefore likely made it more difficult for her to do her job.

Less harassing because it was not directed at her, but still harassment of sorts, were the comments Hall heard male employees make about other female employees.  Harassing statements not directed at the plaintiff herself have less impact than statements or conduct aimed directly at her.  *McPhaul v. Board of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000).  The evidence shows that such comments were fairly frequent.

The Court also considers Hall's extended assignment to the kitchen as a part of the hostile environment because there is sufficient evidence from which a reasonable jury could find that it was in retaliation for her not acquiescing to Parker's desire for sexual banter with female officers.  Regardless of who made the final job assignments, the evidence shows that women who acquiesced got better job assignments than those who did not, and that it was common knowledge around the prison that kitchen assignments were used as punishment.  Furthermore, Hall's assignment lasted a year, four times longer than a correctional officer's normal assignment to a particular task.  The kitchen assignment was not severe, but it certainly was pervasive.  Beyond the initial 90-day period, it was a daily reminder that she was disappointing someone – Parker or the assigner of the kitchen duties – because she was not living up to their

18

expectations of how female correctional officers are supposed to behave.  In combination with the sexual comments and questions to Hall by four superior officers and the sexual comments directed at other female employees, Hall's one-year assignment to the kitchen tips the balance such that a reasonable jury could find an abusive working environment.  For this reason, IDOC is not entitled to summary judgment based on the lack of a hostile environment.

In making its decision, the Court did not consider the incidents Hall did not know about while working at the prison.  "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."  *Mason*, 233 F.3d at 1046.  Thus, the Court cannot consider the comments about female correctional officers' attractiveness or sexual jokes outside Hall's presence, including the comments to Fields and Gunn, or any other incident about which Hall did not know.

The Court will now consider whether IDOC can be liable for the foregoing harassment.

### 3.    Employer Liability

The Court finds that IDOC may be liable for the sexually harassing hostile environment experienced by Gunn.  The standards applicable to the question of whether an employer is liable for a hostile work environment depend on whether the harassment was caused by the victim's supervisor or a coworker.  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).

Generally, employers are vicariously liable for an actionable hostile environment created by a supervisor with authority over the victimized employee.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998);  *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).  If the harassment culminated in tangible employment action against the employee, the employer is strictly liable for the supervisor's acts.

19

*Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 760-61; *Rhodes*, 359 F.3d at 505.  However, if

the supervisor did not take any tangible employment action against the employee, as it did not in

this case, the employer may raise an affirmative defense to liability or damages.  *Faragher*, 524

U.S. at 807; *Ellerth*, 524 U.S. at 765; *Rhodes*, 359 F.3d at 505-06.  To succeed in its affirmative

defense, the employer must show (1) that it exercised reasonable care to prevent and correct

promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by her employer or to avoid

harm otherwise.  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Molnar*, 229 F.3d at 600.

     If, on the other hand, the actionable hostile work environment was created by a coworker

as opposed to a supervisor, a plaintiff must show that the employer was negligent in discovering

or remedying the harassment.  *Loughman v. Malnati Org., Inc*., 395 F.3d 404, 407 (7th Cir.

2005); *Parkins v. Civil Constructors of Ill., Inc*., 163 F.3d 1027, 1032 (7th Cir. 1998).  An

employer can escape liability by showing that its response to the possibility of harassment was

timely and reasonably likely to prevent the harassment.  *Parkins*, 163 F.3d at 1032; *Saxton v.

American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993).  Furthermore, the employer's actions

are not required to *actually* prevent further harassment, as long as it was *reasonably likely* to

prevent future harassment.  *Parkins*, 163 F.3d at 1035; *Saxton*, F.3d at 536.

### a.   Supervisor or Coworker

     If Hall's harassers were her supervisors, IDOC would be vicariously liable for their

harassment of Hall unless IDOC can establish the *Faragher/Ellerth* affirmative defense.  If, on

the other hand, her harassers were mere coworkers, IDOC will only be liable if it was negligent

in discovering or remedying the harassment of Hall.  Hall contends that Parker and Turner were

her supervisors because, as lieutenants, they outranked her, a correctional officer.  On the other side, IDOC argues that Parker and Turner were mere coworkers because they did not have the authority to hire, fire, promote, demote, transfer or discipline correctional officers like Hall.  Neither side addresses the question of whether Hoepker and Qualls, both captains and therefore higher in rank than lieutenants, are supervisors.

For Title VII purposes, a supervisor is someone with the power to directly affect the terms and conditions of the specific plaintiff's employment, not just an employee with some kind of managerial authority.  *Rhodes v. Illinois Dep't of Transp*., 359 F.3d 498, 506 (7th Cir. 2004); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002).  Supervisory authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee," and in the absence of at least some of this authority, an employee is not a supervisor for Title VII purposes.  *Hall*, 276 F.3d at 355 (citing *Parkins v. Civil Constructors of Ill., Inc*., 163 F.3d 1027, 1034 (7th Cir. 1998)).  It does not include "an employee merely having authority to oversee aspects of another employee's job performance."  *Rhodes*, 359 F.3d at 506.  For example, in *Hall* a harasser was found not to be an employee's supervisor where he directed her work operations, had input into her performance evaluations and trained her.  *Hall*, 276 F.3d at 355.  On the other hand, a harasser was found to be a supervisor for Title VII purposes where he did not have the authority to make hiring, firing, promotion or disciplinary decisions about the victim but occasionally acted as her commanding officer and had the ability to initiate disciplinary proceedings against her.  *See Gawley v. Indiana Univ.*, 276 F.3d 301, 310-11 (7th Cir. 2001).

The Court finds that IDOC has not met its burden of showing Hall cannot prove that the IDOC personnel who harassed her were her supervisors.  It focuses on Parker and Turner, but

neglects to present any evidence to show that Captains Hoepker and Qualls, both of whom made some offensive comments and at least one of whom was responsible for Hall's extended kitchen assignment, were not Hall's supervisors.  In the absence of any evidence on the question, there remains a genuine issue of fact on the matter.  Thus, the Court must assume for the purposes of this motion that Hall can show Hoepker and Qualls were her supervisors and that IDOC could be vicariously liable for the harassment of Hall unless it can establish the *Faragher/Ellerth* affirmative defense.

b.   <u>Affirmative Defense</u>

As noted earlier, an employer will not be liable for the harassing environment created by its supervisors if it did not take a tangible employment action and if it can establish (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).

I.   <u>IDOC's Reasonable Care</u>

There is a genuine issue of fact about whether IDOC exercised reasonable care to prevent and correct promptly sexually harassing behavior about which it knew.  Having a sexual harassment policy is not enough, by itself, to establish the first element of the *Faragher/Ellerth* defense.  *Cerros v. Steel Techs., Inc*., 398 F.3d 944, 953 (7th Cir. 2005).  The promulgation and use of a policy can, however, show that an employer took reasonable care to prevent sexual harassment.  *Id.*; *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999).

22

In this case, it is apparent that IDOC took some care to prevent sexual harassment by promulgating a sexual harassment policy that forbid a broad range of sexually harassing conduct and offered the victim of such conduct multiple channels to report policy offenders. The evidence shows, however, that IDOC's efforts to educate its employees about the policy and ensure their compliance with it were lacking. Hall testified that IDOC's efforts at sexual harassment education were not serious; the policy was redistributed in yearly training without any real attempt to explain the policy or educate IDOC employees about how the policy translated into the real workplace. Indeed, Parker and Turner, both of whom had presumably attended numerous yearly training sessions on sexual harassment, displayed fundamental misunderstandings of and disregard for the substance of the policy, including what was forbidden and when conduct covered by the policy must be reported. This is sufficient evidence from which a reasonable jury could find that IDOC's efforts to prevent sexual harassment fell short of reasonable.

Because IDOC has not shown that it exercised reasonable care to prevent sexual harassment, it cannot establish the *Faragher/Ellerth* defense in this motion, and the Court need not address the adequacy of IDOC's correction measures or of Hall's reporting. The Court must therefore deny IDOC's motion for summary judgment on Hall's sexual harassment claim.

C.     Retaliation

In her response to IDOC's summary judgment motion, Hall argues that IDOC retaliated against her because Turner failed to investigate his suspicions that Hall's kitchen assignment was given as punishment and because after she complained of sexual harassment, several of her coworkers shunned her, which made Hall feel like she could not rely on her fellow officers to

23

protect her safety.  She also believes that IDOC retaliated against her when Turner threatened her to refrain from getting involved in Markel's investigation, when Qualls sent officers to check on her in the tower, and when Hoepker refused to approve some of her leave requests during the two-month period between the interview and her resignation.

To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an indirect, burden-shifting method.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Under the direct method, the plaintiff must present evidence, either direct or circumstantial, of a causal connection between a statutorily protected activity and an adverse action taken by the employer.  *Rhodes*, 359 F.3d at 508; *Stone*, 281 F.3d at 644.  The Court need not review the *McDonnell-Douglas* burden-shifting mechanism as it applies to retaliation claims because it finds that Hall can withstand summary judgment using the direct method.

As a preliminary matter, the Court notes that it does not consider Hall's first alleged retaliatory action, Turner's failure to investigate Hall's kitchen assignment, as retaliatory. Turner's failure to investigate began *before* she engaged in any statutorily protected activity. Logic dictates that an event beginning before another event (or any anticipation of it) could not have been caused by the later event.  Thus, she cannot establish that Turner's failure to investigate was retaliatory.

As for her other alleged retaliatory conduct, a reasonable jury could find that the actions Hall believes were in retaliation for her sexual harassment complaints were adverse actions sufficient to support a Title VII retaliation claim.  While what constitutes an adverse action in the

Title VII retaliation context has engendered much confusion among the Courts of Appeals, the

Supreme Court has recently clarified the appropriate standard in *Burlington Northern & Santa*

*Fe Railway Co. v. White,* 126 S. Ct. 2405, 2410-11 (2006).  In *White*, the Supreme Court held

that the adverse action necessary for a retaliation case did not need to affect the terms and

conditions of an employee's employment and did not even need to occur at the workplace.  *Id.* at

2409, 2414.  Instead, it held that a successful Title VII retaliation plaintiff must only establish an

"employer action[] that would have been materially adverse to a reasonable employee."  *Id.* at

2409.  In cases like *White*, actions that are "harmful to the point that they could well dissuade a

reasonable worker from making or supporting a charge of discrimination" would qualify.  *Id.*  A

similar standard would apply where adverse action is allegedly in retaliation for complaining of

sexual harassment.

There is no evidence showing that many of the alleged retaliatory actions by themselves

– coworkers' shunning Hall, Qualls's sending officers to check on her, Hoepker's denial of

certain leave requests – would be sufficiently harmful to dissuade a reasonable officer in Hall's

position from reporting sexual harassment.  None qualify as objectively serious actions.

However, Turner's threat is a different story.  The Court gives great weight to that action which,

although not very specific, carried with it the implication that if she participated in the

investigation, he would use his supervisory authority against her.  The threat itself, which has the

potential to be carried out directly through official employment actions or indirectly by effecting

numerous intangible aspects of employment like coworker relations, is sufficient to dissuade a

reasonable employee from reporting sexual harassment.  The Court also finds that the causal

connection between Hall's participation in the investigation and Turner's threat is self-evident

from the content of the threat.  For this reason, the Court must deny IDOC's motion for summary judgment on Hall's retaliation claim.

## IV.     Conclusion

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** IDOC's motion (Doc. 34).  The motion is **GRANTED** to the extent that it seeks dismissal of Hall's sex discrimination claim in Count I, and the motion is **DENIED** to the extent that it seeks dismissal of Hall's sexual harassment claim in Count I and her retaliation claim in Count II.  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**Dated:  September 12, 2006**

s/ J. Phil Gilbert
**J. Phil Gilbert, U.S. District Judge**