IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA FIELDS, PAM GUNN, ROBIN        )
HALL, AND YEVETTE HAMILTON,          )
                                     )
            Plaintiffs,              )
                                     )
      vs.                            )          Case No. 03-cv- 4222-JPG
                                     )
THE ILLINOIS DEPARTMENT OF           )
CORRECTIONS,                         )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendant Illinois Department of Corrections ("IDOC") as to the claims in this case raised by

plaintiff Yevette Hamilton ("Hamilton") (Doc. 33).[1]  Hamilton has responded to the motion

(Doc. 60) and IDOC has replied to that response (Doc. 71).  In this case, Hamilton alleges that

IDOC, her employer, is liable under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.,

for sex discrimination, for sexual harassment and for retaliation because she complained of that

harassment.[2]  IDOC contends that some of Hamilton's claims are time-barred, Hamilton cannot

---

[1]The Court notes that IDOC filed four separate summary judgment motions in this case, one addressed to each plaintiff's claims.  In ruling on each of the motions, the Court has been careful to confine its consideration to the evidence presented in connection with that particular motion and not to other evidence presented in connection with the other three motions, even if such other evidence would have been relevant to the motion at hand.  To the extent that the Court's rulings are inconsistent, that inconsistency is a product of the different evidence presented by the parties in connection with each motion and not by an improper application of the law.

[2]The Court construes this case as not asserting a "pattern-or-practice" Title VII cause of action.  Although the plaintiff's response to the summary judgment motion referred in passing to a "pattern-or-practice" theory, it analyzes this case as if it only asserted individual claims, confirming that she does not intend to assert such a claim.

establish a case of discrimination, sexual harassment or retaliation and that, if she can establish a

sexual harassment case, it is entitled to assert an affirmative defense.

## I.      Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v.

Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Spath*, 211 F.3d at 396.  This standard is applied with special scrutiny in cases, such as

employment discrimination cases, that often turn on issues of intent and credibility.  *Michas v.

Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party

fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving

party even if the opposing party fails to present relevant evidence in response to the motion.

*Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest

upon the allegations contained in the pleadings but must present specific facts to show that a

genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson

v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not

demonstrated by the mere existence of "some alleged factual dispute between the parties,"

*Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692.

Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict

for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord*

*Michas*, 209 F.3d at 692.

## II.    Facts

Taken in the light most favorable to Hamilton, the evidence establishes the following

facts.[3]

### A.    IDOC's Sexual Harassment Policy

Hamilton, a woman, has worked as a Food Supervisor II at Shawnee Correctional Center

("Shawnee"), a high-medium security IDOC facility, since December 1999.  At all relevant

times, IDOC had a written sexual harassment policy, Administrative Directive ("AD")

03.01.310.  As of December 1, 2002, that policy provided that sexual harassment included

"verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably

interfering with an individual's work performance or creating an intimidating, hostile, or

offensive working environment."  A.D. 03.01.310 § II.E.  The policy specifically noted that

sexual harassment included

> Verbal conduct such as sexual innuendos, suggestive comments, insults, humor,
> or jokes about sex, anatomy, or gender-specific traits, sexual propositions, threats,
> repeated requests for dates, or statements about other employees, even outside
> their presence, of a sexual nature,

---

[3]The Court has omitted several alleged "facts" because they are supported only by hearsay, statements without personal knowledge, or otherwise inadmissible evidence.  In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial.  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

*Id.* at § II.F.1.d., and

> Physical conduct such as unwelcome hugging, touching, or kissing, pinching,
> brushing the body, coerced sexual acts, or actual assaults,

*Id.* at § II.F.1.g.  The policy forbid engaging in or condoning sexual harassment, and obligated

supervisors to "address[] an observed or reported incident of sexual harassment as a serious form

of employee misconduct."  *Id.* at § II.G.  It also required employees who witnessed or were

aware of sexual harassment to report it in an incident report.  *Id.* at § II.G.3.  The policy also

forbid retaliation against an employee who alleged sexual harassment in good faith.  *Id.* at § II.K.

The internal sexual harassment reporting policy in AD 03.01.310 required an employee

who believed she was being harassed to notify her supervisor and document the incident with an

incident report, to notify the next person in the chain-of-command if the supervisor was the

harasser and document the incident with an incident report, or to notify IDOC's Office of

Affirmative Action.  *Id.* at § II.H.2.  The IDOC employee receiving the report was then required

to notify the warden of the facility, who was then required to notify the Office of Affirmative

Action and to review and respond to the allegations within five working days, which may have

included referring the matter for a formal investigation.  *Id.* at § II.H.4. & 6.  If it was determined

that sexual harassment occurred, the warden was required to take "prompt, appropriate corrective

action, including discipline, lockout, or other similar measures."  *Id.* at § II.H.8.c.  Although the

policy urged employees to use the internal complaint process to obtain a resolution to sexual

harassment complaints, it also allowed an employee to proceed directly to the Illinois

Department of Human Rights or the Equal Employment Opportunity Commission ("EEOC").

*Id.* at § II.F.7.

All IDOC employees were trained yearly about sexual harassment, which included

review of the sexual harassment policy, watching a training video, taking a test and participating in a general discussion.  The trainer told Hamilton where she could obtain a copy of the sexual harassment policy, but Hamilton never got or read the policy.

      B.     <u>Hamilton's Employment</u>

When Hamilton began working at Shawnee, other IDOC employees of all ranks continually needled Hamilton by telling her they thought she had been hired only because she had slept with a deputy director of IDOC.  In fact, Hamilton was a good employee, never caused any serious difficulties in the workplace and performed her job in a satisfactory manner.

Hamilton complains of several instances of conduct directed toward her:

In the spring of 2000 or 2001, food supervisor James Randolph ("Randolph") believed Hamilton was not doing her job as it was supposed to be done and got into an argument with her. He called Hamilton a "black bitch"[4] and accused her of working at Shawnee simply to have sex with the inmates.  Hamilton filed an incident report, and IDOC terminated Randolph.  After Randolph grieved the disciplinary action, it was reduced to a 20-day suspension, after which he was assigned to work with Hamilton again.  He was not required to attend any additional discrimination or harassment training other than the routine yearly training.  Since the time he was reassigned to work with Hamilton, she has had no further problem with him.

Since Hamilton began working at Shawnee, every night she worked on the midnight shift (which was when she usually worked) she was issued a radio with a dead or nearly dead battery. In addition, since reporting Randolph in the spring of 2000 or 2001, on the occasions her radio

---

[4]Randolph called her other racially derogatory names that the Court need not repeat in light of the fact that this is a sex discrimination, not a race discrimination, case.

battery had a charge, every time Hamilton tried to contact someone over the radio during the midnight shift, she received no response, although she received responses when she worked on the day shift.  This jeopardized her safety because she was unable to call for help on the radio if she needed it, and she was often in isolated parts of the kitchen where she might be vulnerable to inmate attacks.  On one occasion, a correctional officer in a verbal confrontation with Hamilton told her that no one would respond if she called for help over the radio.  Hamilton reported this to Lieutenant Laster and filed an incident report but nothing was done.

When Hamilton walked down a certain walkway in the prison, inmates would say derogatory things to her and look at her in a sexually suggestive manner, which violated prison rules, but the correctional officers present would  not attempt to stop the inmates' conduct.  In addition, Hamilton has complained about the officers' inaction, and nothing has been done.

On one occasion during an internal investigation for misconduct, Lieutenant McGill ("McGill"), Shawnee's internal affairs investigator, told Hamilton that if she stopped getting her hair done, gained weight and looked less attractive, she would not be under investigation as often was she was.

At some point, a correctional officer observed Hamilton serving a meal to inmates and told her that she did not know how to do her job and that she did not deserve her job.  The incident ended up with the captain and two correctional officers yelling at Hamilton, who then demanded that she be treated with more respect.  Hamilton was not disciplined for the incident and did not file an incident report over the matter.

Inmates did not like to be supervised by female officers, so they often made false accusations against them.  In 2001, one of those false accusations led to an investigation of

6

Hamilton for alleged inappropriate conduct with an inmate.  As a part of that investigation, prison personnel searched the cell of the inmate in question.  The investigation was unable to substantiate any allegations against Hamilton.

In April 2002, Hamilton reported to work in her white uniform and it began to rain.  She requested a raincoat to wear from the administration building to the kitchen, her work site.  Raincoats were available and were supposed to be issued to food supervisors in such situations, but a correctional officer and Lieutenant Turner ("Turner") both refused to give her one, and Turner instead told her to wear a garbage bag like inmates do.  Hamilton refused to report to the kitchen without a raincoat and told Turner that she would not participate in a "wet tee shirt contest."  Another lieutenant eventually gave Hamilton a raincoat, and she reported to the kitchen.  Hamilton filed an incident report over the matter.

On another occasion, Turner hid in a closet in the dining room, then jumped out and scared Hamilton.  She filed an incident report over the matter.  Hamilton's supervisor responded to the incident report by telling her Turner was doing his job.

Other officers not assigned to the kitchen would look into or come into the kitchen to spy on Hamilton.  On the other hand, Turner and Lieutenant Parker ("Parker"), who were assigned to check on Hamilton in the kitchen, would not check on her or even talk to her while she was working.  They would check on Matt Wettig, a male food supervisor, and other lieutenants checked on Hamilton.  Hamilton filed an incident report about Parker's and Turner's refusal to check on her in the kitchen.

The sexual harassment Hamilton alleges did not include any instances of physical touching.

7

In addition, to the aforementioned conduct directed toward Hamilton, IDOC employees exhibited objectionable conduct directed toward other women IDOC employees:

Lieutenants and correctional officers would review the pictures of incoming female guards, comment on their attractiveness, and bet with each other about how long it would take them to sleep with the new employees.  In fact, sometime in or prior to December 2000, Hamilton overheard correctional officers refer to new female employees as "fresh meat," comment on their appearances, and speculate about which officer was going to sleep with each new female employee first.  When co-plaintiffs Linda Fields ("Fields") and Pam Gunn ("Gunn") were hired in the fall of 2000, they were subjects of one of the betting pools, and Hamilton saw two male lieutenants and several male correctional officers gathered in the gatehouse examining ID cards of new employees.  Later, she continued to hear officers refer specifically to Fields and other female employees as "fresh meat," although she never heard anyone apply that label to her.

Hamilton also overheard numerous sexual innuendos and comments about female IDOC personnel's physical appearances, all of which she described as common-place for the work environment.  Indeed, it was also not unusual for male correctional officers to talk about the physical attributes of female officers outside their presence.  Hamilton did not report the comments she heard because she believed that reporting them would "make [her] life more miserable, and [hers] was miserable enough."

In addition, Parker and Turner would hear correctional officers making sexual comments or telling sexual jokes but would not object to them except, in Turner's case, if women were present.

Hamilton had several conversations with at least two other male Shawnee employees

who speculated that females work at Shawnee only because they want to or do, in fact, have sex with the inmates.  The male employees pointed as examples to three female food supervisors who predated Hamilton's tenure at Shawnee who were accused of having sexual relationships with inmates and who either resigned or were terminated as a result of those accusations. Hamilton did not report those conversations at the time.  She did, however, alter her work habits so as never to be alone with an inmate and subject to accusations for which there would be no witnesses.

In addition, two lieutenants failed to report rumors that Parker had engaged in a consensual sexual relationship with a subordinate female officer ("J.C.") under his supervision while on duty at Shawnee, a violation of a standard of conduct, although one of those lieutenants did interview Parker about the rumor.  Parker admitted that he had a "personal relationship" with J.C. during work hours but did not specify further the nature of that relationship.

C.     Sexual Harassment Complaints and Investigation

Fields submitted an incident report on September 8, 2002, complaining of sexual harassment of herself and female employees at Shawnee in general as well as retaliation for failing to acquiesce in the sexual harassment.  Her report focused on Parker and Turner and indicated that Hamilton was willing to testify to the sexual harassment.  In response to Fields's incident report, IDOC directed Captain Homer Markel ("Markel"), an officer from another IDOC facility, to investigate sexual harassment at Shawnee.  He interviewed Hamilton as a part of his investigation.  On October 10, 2002, Markel concluded that Parker and Turner violated IDOC's sexual harassment policy and that Turner violated other IDOC policies as well, including a standard of conduct that forbid interfering with an investigation by intimidating

9

witnesses.  Markel further recommended that Parker and Turner receive additional training on sexual harassment.  Ultimately, Parker received a written warning and Turner received a one-day suspension.  Neither Parker nor Turner received any additional training beyond the yearly training already provided.

On October 10, 2002, the same day Markel issued his report, Hamilton signed a charge with the EEOC complaining of race and sex discrimination, racial and sexual harassment and retaliation.  The EEOC received the charge November 12, 2002.  It issued Hamilton a right to sue letter, and on December 16, 2003, she, along with three other female IDOC employees, filed this lawsuit asserting claims of sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) (Count I) and retaliation for complaining to their supervisors of that sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count II).

D.      Post-Complaint Treatment

In December 2003, another inmate falsely accused Hamilton of inappropriate conduct with an inmate, D'Angelo Harris ("Harris"), who worked in the kitchen with Hamilton on the midnight shift and who had recently applied to be transferred from Shawnee.  After hearing rumors that Hamilton was having a sexual relationship with Harris, McGill spoke with Harris, who denied the relationship, pointing out that it was illogical for him to request a transfer if he was having an affair with Hamilton at Shawnee.  McGill then informed Harris that he had stopped his transfer.

On or about December 11, 2003, Richard Harrington ("Harrington"), an IDOC deputy commander of state investigations for southern Illinois, began investigating the allegations

against Hamilton.  Harrington conducted four inmate interviews during the first week of his investigation, which sparked rumors among the inmate population that Hamilton liked having sex with inmates.  These rumors caused inmates Hamilton supervised to lose respect for her and to believe that they could say and do anything they wanted under her supervision.  Hamilton reported these inmate problems to her supervisor.

Harrington then did not conduct any additional interviews until May 2004, when he interviewed Harris.  At some point in their discussions with Harris, Harrington and McGill asked Harris to cooperate in setting Hamilton up in return for getting transferred out of Shawnee and to report to Harrington and McGill every day or risk being sent to segregation housing.  They also told him that if he refused to cooperate, he would be sent to a higher security institution.  The investigators approached Harris three times with their offer, but Harris refused to cooperate.  Instead, he filed a grievance alleging that McGill and Harrington had threatened him if he did not lie for them, but McGill shredded the grievance.  Harris then arranged for a grievance to be smuggled out of Shawnee and sent directly to IDOC's Springfield office, but the grievance was denied.

On or around August 4, 2004, Hamilton filed another EEOC charge, this time alleging retaliation in response to her filing of this lawsuit.  She claimed that IDOC threatened inmates to induce them to make false accusations against Hamilton because she filed this lawsuit.

After another hiatus of several months and also on August 4, 2004, Harrington revived the investigation and began interviewing IDOC employee witnesses.  While Harrington was unable to substantiate any sexual misconduct, he did find out in his interview with Hamilton on October 26, 2004, that Hamilton had telephoned Harris's grandmother to get a copy of the

11

grievance Harris had managed to have filed at IDOC's Springfield office.  Hamilton did not realize at the time that such conduct violated prison rules against "socializing" with inmates' relatives.  Hamilton went before the Employee Review Board ("ERB"), which recommended that Hamilton be suspended for 25 days.  The warden viewed impermissible socialization very seriously.  He therefore concurred with the ERB recommendation and issued Hamilton a 25-day suspension.  The discipline was reduced to a 17-day suspension after Hamilton grieved the matter.  Harris was transferred out of Shawnee.

In contrast, sometime between 1995 and 1998, under the leadership of a different warden, food supervisor Oscar Talmadge ("Talmadge") was seen lying on the kitchen floor with inmates under his supervision tickling him.  Talmadge was not disciplined for the incident.

Hamilton experienced stress and emotional trauma from the events set forth above.  As a consequence, her marriage has been troubled and she has been forced to seek psychiatric treatment.

The EEOC issued Hamilton a right to sue on her second charge, and on December 2005, the plaintiffs amended their complaint to add a new retaliation claim.  The Amended Complaint adds an additional claim, as to Hamilton only, of retaliation for filing this lawsuit, in violation of Title VII, 42 U.S.C. § 2000e-3(a) (Count III).

## III.   Analysis[5]

---

[5]The Court is dismayed by the disorganization of the plaintiff's brief, despite her having been given a second chance at formulating an appropriate brief.  Nevertheless, the Court has bent over backwards to do justice to the parties in this case by deciphering the plaintiff's confusing and sometimes illogical arguments.  The Court reminds the plaintiff that it is not its job to do counsel's work of organizing or formulating a party's arguments, *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999), nor is it the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment."  *Bombard v. Fort Wayne Newspapers, Inc.*,

Title VII prohibits discrimination on the basis of sex:  "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  It also prohibits retaliation for reporting sex discrimination:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

The Court will address each of Hamilton's three Title VII theories in turn.

A.    Sex Discrimination other than Harassment

It appears that Hamilton is alleging that she was treated differently because of her sex in ways other than harassment.  To withstand a motion for summary judgment on this type of disparate treatment sex discrimination claim, a Title VII plaintiff may present direct proof of discrimination through direct or circumstantial evidence.  *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001);  *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).  A plaintiff may also proceed using the burden shifting mechanism outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

---

92 F.3d 560, 562 (7th Cir. 1996).  "Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  To the extent that the Court has been unable to detect an argument intended to be advanced by the plaintiff, the Court finds that the argument is waived because it was not properly supported.  *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000);  *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

Under the direct method of proving discrimination, the plaintiff may rely on direct evidence of an acknowledgment of discriminatory intent or on circumstantial evidence sufficient to provide a basis for inferring intentional discrimination as motivating the employer's adverse employment action.  *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)).  Historically, direct evidence has been viewed as evidence that is within a witness's personal knowledge and does not require drawing an inference to support the proposition for which it is offered, and circumstantial evidence has been viewed as evidence requiring such an inference.  *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).  This distinction is vague and irrelevant;  any evidence supporting a finding of discrimination is sufficient to withstand summary judgment under the direct method.  *Id.*

Under the *McDonnell Douglas* indirect method, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she was treated less favorably than others not in the protected class who were similarly situated.  *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003).  A plaintiff's successful demonstration of each of these elements creates a rebuttable presumption of discrimination.  *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003**)**.  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext.  *Id.*  At the pretext stage, the plaintiff need not provide evidence of the defendant's discriminatory motive so long as

14

he provides evidence from which a reasonable trier of fact could find that the proffered reason was not genuine, that is, was a lie. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006); *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 699 (7th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000)). It is important to note that the ultimate burden of persuasion remains at all times with the plaintiff. *Reeves*, 530 U.S. at 143 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Hamilton argues that she can establish sex discrimination through both the direct and indirect methods. IDOC, on the other hand, challenges Hamilton's ability to prove that she suffered an adverse employment action, a requirement for proceeding under either method. *Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 611-12 (7th Cir. 2001).

In order to establish an adverse employment action as that phrase is understood in the Title VII context, a plaintiff must show a "quantitative or qualitative change in the terms or conditions of [her] employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003); *see Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). Adverse employment actions generally fall into three categories.

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment – an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."

15

*Tart v. Illinois Power Co.*, 366 F.3d 461, 475-75 (7th Cir. 2004) (quoting *Herrnreiter*, 315 F.3d at 744-45) (emphasis in original).  "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.  A tangible employment decision requires an official act of the enterprise, a company act." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998).

However, "not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (internal quotations, citations and ellipsis omitted).  Actions that do not significantly affect a plaintiff's job responsibilities or benefits, or actions that cause mere inconveniences, cannot be tangible employment actions.  *Id.*.

In this case Hamilton has not shown any tangible job consequence she suffered because of her sex.  To the extent that Hamilton may be alleging that her workplace was rendered unsafe because she was issued a radio with low or spent batteries, because no one responded to her radio calls and because Parker and Turner refused to check on her in the kitchen, Hamilton's brief clearly indicates she believes that conduct was in retaliation for her reporting Randolph, not because of her sex.  Hamilton's Resp. Sum. J. Mot. at 11-12.  Furthermore, she has not presented any direct or circumstantial evidence that such conduct was motivated by her sex or that similarly situated male employees were treated differently

To the extent that Hamilton complains that her 17-day suspension for calling Harris's grandmother is an adverse employment action, she is right, but she has failed to present any direct or circumstantial evidence that such conduct was motivated by her sex or that similarly

situated male employees were treated differently.  To the extent that she believes Talmadge was

a similarly situated male, he was not.  To be similarly situated, an employee must be "directly

comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680

(7th Cir. 2002).  Those "material respects" depend on the specific situation involved in the case

and may include whether the employees dealt with the same supervisor, were subject to the same

standards, or had comparable experience, education and qualifications, if the employer took

these factors into account when making the personnel decision in question.  *Id.*  Talmadge's

tickling incident is not the same as and occurred years before Hamilton's rule violation, and it

was under a different warden's leadership.  Thus, he is not similarly situated to Hamilton.

Furthermore, as discussed later in this order, the evidence suggests that such conduct was meant

as retaliation for her complaints about discrimination and harassment and was not based on any

animus against women.  *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 809 (7th Cir. 2001)

(noting that an employer's conduct motivated by the plaintiff's filing of a sexual harassment

complaint and not by plaintiff's gender must be argued as a retaliation claim).

For these reasons, the Court finds that there is no genuine issue of material fact and

IDOC is entitled to judgment as a matter of law on Hamilton's sex discrimination claim other

than her hostile environment harassment claim.

      B.   <u>Harassment</u>

The sex discrimination prohibited by Title VII includes harassment that creates an

environment that is so severe or pervasive that it alters the condition of the victim's employment

and creates an abusive working environment even where there is no tangible employment action.

*Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).  "Harassment is not limited to acts of

sexual desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001) (internal quotation marks and citations omitted).  Courts generally refer to these types of cases as "hostile environment" cases.  The Court views Hamilton's claim as such a case and not as a *quid pro quo* sexual harassment case (to the extent that those labels are helpful in sexual harassment cases) because Hamilton has not provided evidence of a tangible employment action resulting from the harassment.

In this case there is no evidence of a tangible employment action taken as a consequence of harassment.  As noted above, Hamilton contends, and the evidence suggests, the two actions that arguably constitute adverse employment actions – her unsafe working environment and her 17-day suspension – were in retaliation for complaining of discrimination and harassment;  no evidence supports the inference that those actions were taken because Hamilton is a woman or because she failed to acquiesce to sexual harassment.  There is simply no evidence that any harassment affected the tangible aspects of Hamilton's job because she did not acquiesce to the harassment.  Thus, the Court treats Hamilton's claim as a hostile environment claim.

In this case, with respect to the question of whether Hamilton's work environment was an actionable hostile environment, IDOC first argues that the Court cannot consider conduct that occurred before January 15, 2002, 300 days before Hamilton filed her first EEOC charge, because of the 300-day limitation period for reporting discrimination to the EEOC.  It then argues that Hamilton cannot establish that the conduct she describes was severe or pervasive enough to be actionable and that it is entitled to assert an affirmative defense because Hamilton

18

did not report the harassment.  Hamilton disagrees an all counts.  The Court will address each of
IDOC's arguments in turn.

        1.     <u>Statute of Limitations</u>

      IDOC asks the Court not to consider evidence of Hamilton's conflict with Randolph in
2000 or 2001, the "fresh meat" and betting pool comments in or before December 2000.  It
argues that those instances occurred more than 300 days before Hamilton filed her first EEOC
charge on November 12, 2002.

      Title VII requires a plaintiff to present her Title VII claims to the EEOC before filing a
federal lawsuit.  42 U.S.C. § 2000e-5(f)(1);  *National R.R. Passenger Corp. v. Morgan*, 536 U.S.
101, 109 (2002);  *Gorence v. Eagle Food Ctrs, Inc*., 242 F.3d 759, 763 (7th Cir. 2001).  In
Illinois, a plaintiff has 300 days from the date of the alleged discrimination to file a charge with
the EEOC.  *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352 (7th Cir. 2002);  *Shanoff v. Illinois
Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001);  *see* 42 U.S.C. § 2000e-5(e)(1).  A
plaintiff then has 90 days from the date she receives a "right to sue" letter from the EEOC to file
a lawsuit.  42 U.S.C. § 2000e-5(f)(1);  *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).
Unless equitable defenses apply, *see Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982), a
plaintiff may challenge only conduct that occurred within 300 days of the filing of her EEOC
charge.  *See Foster v. Arthur Andersen, L.L.P.*, 168 F.3d 1029, 1035 n. 9 (7th Cir. 1999);  42
U.S.C. § 2000e-5(e).

      This rule is applied in a special way in hostile work environment cases.  Where multiple
incidents contribute to the same hostile work environment, it does not matter that some incidents
occurred outside the 300-day window, so long as an act contributing to the hostile environment

occurred within the filing period.  *Morgan*, 536 U.S. at 117.  This is because, although the creation of a hostile environment is usually composed of a series of acts, the hostile environment itself constitutes a single unlawful employment practice under Title VII.  *Id.*  If that single unlawful employment practice continues to exist within 300 days of the EEOC charge, all acts contributing to it are actionable and a plaintiff may recover damages for its entire duration  *Id.* at 117-19.

In this case, Hamilton claims that Randolph's conduct, the "fresh meat" comments and the betting pool are part of the same hostile environment that extended beyond January 2002.  Thus, under *Morgan*, they can be considered in determining whether Hamilton's work environment was sufficiently hostile to be actionable.

### 2.    Hostile Environment

The Court concludes that Hamilton has not presented enough evidence from which a reasonable jury could find that she was subject to an actionable hostile environment.  A hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)) (further internal quotations omitted); *see also*; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998);  *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003).  "Harassment need not be severe *and* pervasive to impose liability;  one or the other will do."  *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

Whether an environment is objectively sufficiently hostile or abusive must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct;  its

severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-788 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)) (further internal quotations omitted); *accord Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888-89 (7th Cir. 2001).  Courts "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive."  *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotations and citations omitted); *accord Breeden*, 532 U.S. at 271. For example, a court has found that "teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" did not amount to an impermissibly hostile environment as a matter of law. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998).  On the other hand, an uninvited kiss and an attempt at a second one, an attempt to remove a plaintiff's bra, and lewd proposition for sex were sufficient to state a hostile environment claim.  *Hostetler*, 218 F.3d at 807-08.

     In addition, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke v. Stefani Mgmt. Servs.*, 250 U.S. 564, 566-67 (7th Cir. 2001) (citing *Harris*, 510 U.S. at 21-22); *accord Murray*, 252 F.3d at 889.

In this case, the evidence establishes that the conduct Hamilton believes was caused because of her sex was neither severe nor pervasive enough to create an objectively abusive working environment.  Hamilton has presented evidence of several isolated instances she believes were based on her sex:  her one-time conflict with Randolph where he called her a bitch, McGill's comments implying that her trouble at the institution was caused because she looked good, a fight with other workers over whether she was doing her job properly, an investigation of sexual misconduct allegations that were ultimately unsubstantiated, the raincoat incident and Turner jumping out of a closet at her.  These instances occurred over at least a one-year period.  There is also evidence of ongoing conduct that Hamilton believes was motivated by sex: correctional officers spying on her, certain lieutenants refusing to check on her, officers refusing to stop inmate catcalls at her, "fresh meat" comments, the betting pools, the comments of several coworkers that women worked at Shawnee in order to have sex with the inmates, numerous comments that Hamilton got her job by having sex with an IDOC deputy director and the general unreported ongoing sexual jokes and comments.

No reasonable jury could find this conduct amounts to a hostile environment.  While it surely reflects working with some ignorant or childish coworkers, it is simply not so objectively severe or pervasive that it changed the conditions of Hamilton's employment.  None of the isolated instances was very serious, threatening or humiliating, and none involved any physical touching.  Similarly, the ongoing conduct was fairly innocuous.  Most of it consisted of no more than offensive utterances, some of which were not even directed at Hamilton.  Harassing statements directed at others have less impact on the plaintiff's work environment than statements directed toward her.  *McPhaul v. Madison Co. Board of Comm'rs*, 226 F.3d 558, 567

(7th Cir. 2000).

The Court is careful to note, however, that it has not considered the evidence that Hamilton was not given an adequately charged radio and that other officers refused to respond to her calls.  A reasonable jury could find that such conduct significantly changed the conditions of Hamilton's employment by making her workplace unacceptably unsafe.  Where an employee works directly with inmates in an isolated place like the prison kitchen and where her radio is the only means by which she can call for help in an emergency situation, depriving her of a functioning radio or refusing to respond to her radio calls was the equivalent of leaving her unprotected and exposed to assaults.  However, because Hamilton has asserted that such conduct was motivated by retaliation for her reporting Randolph in the spring of 2000 or 2001 and has not even hinted that such conduct was motivated by her sex, the Court will consider this conduct only to be relevant to Hamilton's retaliation claim.

Because the Court has determined that no reasonable jury could find Hamilton's working environment hostile on account of her sex, the Court need not examine the issues of whether IDOC is entitled to assert the *Faragher/Ellerth* affirmative defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

C.     Retaliation

Hamilton alleges in Count II that IDOC retaliated against her after she complained of sexual harassment to her supervisors in 2000 or 2001 in response to her dispute with Randolph and in 2002 because of her participation in the investigation of Fields's incident report.  She alleges in Count III that IDOC retaliated against her after she filed this lawsuit.  IDOC argues

23

that Hamilton cannot show that her 17-day suspension was in retaliation for protected activity because she admitted to the rule violation for which the suspension was issued.  IDOC is not entitled to summary judgment on either claim.

To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an indirect, burden-shifting method.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Under the direct method, the plaintiff must present evidence, either direct or circumstantial, of a causal connection between a statutorily protected activity and an adverse action taken by the employer.  *Rhodes*, 359 F.3d at 508; *Stone*, 281 F.3d at 644.

While what constitutes an adverse action in the Title VII retaliation context has engendered much confusion among the Courts of Appeals, the Supreme Court has recently clarified the appropriate standard in *Burlington Northern & Santa Fe Railway v. White*, 126 S. Ct. 2405, 2410-11 (2006).  In *White*, the Supreme Court held that the adverse action necessary for a retaliation case did not need to affect the terms and conditions of an employee's employment and did not even need to occur at the workplace.  *Id.* at 2409, 2414.  Instead, it held that a successful Title VII retaliation plaintiff must only establish an "employer action[] that would have been materially adverse to a reasonable employee."  *Id.* at 2409.  In cases like *White*, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" would qualify.  *Id.*  A similar standard would apply where adverse action is allegedly in retaliation for complaining of sexual harassment.  The Court need not review the *McDonnell Douglas* burden-shifting mechanism as it applies to

retaliation claims because it finds that Hamilton can withstand summary judgment using the direct method.

       1.     <u>Count II</u>

As a preliminary matter, the Court notes that IDOC has not addressed Count II in its motion for summary judgment.[6]  The Court construes Count II, as asserted by Hamilton to claim that Hamilton's workplace was rendered unsafe and that she was unduly investigated in 2001 because of her complaints about Randolph and her participation in the investigation into Fields's incident report.  As the Court explained earlier in this order, depriving Hamilton of a functioning radio and refusing to respond to her radio calls were serious and could constitute actions that would have been "materially adverse to a reasonable employee."  *White*, 126 S. Ct. at 2409.

       2.     <u>Count III</u>

The Court construes Count III to complain that IDOC retaliated against Hamilton for filing her second charge with the EEOC and this lawsuit by intentionally inducing an inmate to make false charges of sexual misconduct against Hamilton, knowingly instigating and pursuing a baseless investigation, and issuing punishment that was too severe.  IDOC focuses on the

---

[6]The Court understands why IDOC did not address this claim separately in its motion.  It is impossible to determine from the claim, as pled, on what instances of retaliation Hamilton bases Count II.  Only by consulting Hamilton's summary judgment response brief can the gravamen of this claim be deciphered.  IDOC apparently deciphered this claim, and addressed it in its reply brief, arguing that Hamilton did not file a timely EEOC charge regarding her retaliation for her complaints about Randolph and that she cannot establish adverse action or a causal connection.  IDOC's argument comes too late, however.  It has long been established that arguments in support of the motion that are raised for the first time in a reply brief are waived for the purposes of the motion.  *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998).  This is because the opposing party does not have an opportunity to respond to the new arguments in the reply brief.  *See Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 668 (7th Cir. 1998).  IDOC may raise the issue in a motion *in limine* or a motion for judgment as a matter of law later in connection with the trial of this case.

question of whether Hamilton deserved punishment for the rule violation that was accidentally discovered during the investigation.  This focus is misguided at this stage.  The real issue for the purposes of this motion is whether IDOC's conduct in obtaining the false complaint from Harris and investigating the known false charges – in an investigation that seemed to proceed in fits and starts that suspiciously corresponded to Hamilton's actions in prosecuting this case – were harmful to the point that they would have dissuaded a reasonable correctional officer in Hamilton's position from bringing a sexual harassment or discrimination suit.  *White*, 126 S. Ct. at 2409.  A reasonable jury could find that they were, and the Court therefore cannot grant summary judgment on Count III.

**IV.      Conclusion**

     For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** IDOC's motion (Doc. 33).  The motion is **GRANTED** to the extent that it seeks dismissal of Count I, Hamilton's sex discrimination and sexual harassment claims, and the motion is **DENIED** to the extent that it seeks dismissal of Counts II and III, Hamilton's retaliation claims.  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.


**IT IS SO ORDERED.**
**Dated:  September 12, 2006**

                              **s/ J. Phil Gilbert**
                              **J. Phil Gilbert, U.S. District Judge**